Submitted on record and briefs June 26, reversed November 14, 2007

In the Matter of P. B.,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

P. B.,
*Appellant.*

Washington County Circuit Court
C050026MC; A129314

171 P3d 1042

Susan D. Isaacs filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Anna M. Joyce, Assistant Attorney General, filed the brief for respondent.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

SCHUMAN, J.

**SCHUMAN, J.**

P. B. appeals from a judgment ordering that he be committed to the custody of the Mental Health Division for a period not to exceed 180 days on the ground that he was dangerous to others. We reverse.

In the spring of 2005, appellant's life, from all outward appearances, was more or less in order. He worked as a design engineer at Intel, the microchip company in Beaverton. Although he was under stress due to the responsibilities of his work and the long hours that he devoted to it—sometimes upward of 100 per week—he was, according to his wife, level-headed, reserved, thoughtful, and "very sensible." He had no history of mental illness other than relatively mild depression.

That changed in June 2005. While driving back to his home in Hillsboro from Seattle, where he had been visiting the University of Washington to explore returning to school, he began to experience visual and auditory hallucinations and to detect what he perceived to be coded messages from God informing him that the end of the world was approaching due to the inability of world leaders, George Bush in particular, to avoid violence and resolve their differences through dialogue. The messages informed him that he was appointed to muster an "army" to prevent this imminent Armageddon. The details of his "mission" appear to have been unclear, but they included recruiting his wife and other relatives to form businesses from which the revenue to fund his army would be derived.

When he arrived home, he was agitated, sleepless, frantic, and increasingly irrational, perceiving, for example, that the planned release dates of certain films contained hidden messages relevant to his mission. That mission, he was convinced, had to be accomplished by September 18, 2005, or the world would end.

At the urging of his wife, he voluntarily checked into a hospital for treatment, and remained there for one week, until June 14, 2005. At one point during that hospitalization, he became angry when the staff would not allow him to take a shower, and he had to be restrained. When he returned

home after his release, he was still experiencing delusions. At one point, he told his wife that, if she refused to help him carry out his plan, he would kill her, and the threat was sufficiently serious to alarm her. He also made vague threats to "take care of" people who get in the way of his plan. Later that day, his wife, accompanied by her parents, confronted appellant as he was about to drive to a video store; they believed that he was in no condition to operate an automobile. He vaguely threatened his wife, but she ultimately convinced him to allow her to drive him to the store. There, he loaded several thousand dollars' worth of DVDs into a basket. Before he could pay for them, his wife telephoned her mother, who brought appellant some medication that, apparently, calmed him. At that point, he was persuaded to contact his primary care physician, who insisted that he be rehospitalized. He agreed, and voluntarily checked into Providence Saint Vincent Medical Center.

While there, he was interviewed and evaluated by Rolfe, a mental health investigator, who diagnosed him as bipolar, experiencing a manic episode. Rolfe concluded that appellant was a danger to himself, a danger to others, and unable to provide for his basic personal needs.

Appellant appeared at a commitment hearing on June 22, 2005, after six days of treatment in the hospital. After listening to testimony from his wife (who noted that she would not allow him to return to their home), his mother-in-law, and Rolfe, he testified on his own behalf. He recognized that he had a bipolar disorder and that he needed medication, but he indicated that he would not voluntarily remain in a treatment facility. He also indicated some displeasure with his wife's refusal to allow him to return home; he expressed disappointment in her lack of trust. When asked about his Armageddon delusions and his threats to harm anybody who interfered with his role in them, he responded:

"The plan that we've been talking about, this whole Armageddon, I'm beginning to realize that I was going through a manic state. I realize that some of these messages that I thought I was receiving from God, I have to question the validity of those. And I'm re-evaluating in my own mind what I hold to be true.

"So at this point there is no plan."

On cross examination, the following colloquy occurred:

"Q [by county counsel]: Okay. And in terms of what brought you in the hospital, the idea of the plan and that, do you think there still is, could possibly be a plan? After this?

"A: I'm leaving that open. But in my mind it's still debatable whether that was an accurate revelation from God. I'm calling that more into question nowadays. As my thinking is clearing up, I'm beginning to see how asinine and how ridiculous it sounds.

"Q: But you're not sure that it's completely—

"A: I'm not gonna rule it out. Because I used to be a man of religion when—I was raised through a Catholic family, so I do believe there is a God there. Whether or not He did talk to me two weeks ago is up for debate. Because I've been praying most of my life and I've gotten no response. So for all intents and purposes, I was an atheist and didn't— since my prayers were never answered, I assumed there was no God. Last two weeks' episode called that into question on whether there is a God or not, and I'm still debating one way or the other. I haven't reached a firm conclusion."

Two mental health examiners (in addition to Rolfe, who participated as a mental health investigator) listened to the testimony and examined the witnesses and appellant. Based on observations and on Rolfe's initial report, one of the examiners concluded that appellant was dangerous to himself, dangerous to others, and unable to provide for his basic personal needs. The other reached the opposite conclusions—that is, that appellant was not dangerous to himself or others, and that he was able to meet his basic needs. The court concluded that appellant was not a danger to himself and that he was able to provide for his basic needs, but that he was dangerous to others, and ordered that he be committed:

"The most interesting question then becomes is he dangerous to others. And that really depends upon the close— the continuing, I think is a better way to put it—the continuing presence of the delusional material. The delusional material, which includes commands from God, which were believed when received, and necessitated certain kinds of plans and activities and wouldn't allow anyone to

come between [appellant] and the—executing those plans, even to the point of being harmful to his wife, say that certainly at that point, the point that she took him back to the primary care, he was dangerous to others.

"Then the question comes on, okay, is that still really present in his mind or is it not. And I'm satisfied from the testimony and his actions that it is still present. That he— I'm looking at things like the edge in his voice when he started talking about his wife and some other things, as well as his own testimony.

"He is still under the throes of the need for the plan and its execution, and hence he is still a danger to others and I am going to order that he be hospitalized."

This appeal followed.

■ A "mentally ill person" as defined in ORS 426.005(1)(d) includes

"a person who, because of a mental disorder, is one or more of the following:

"(A) Dangerous to self or others.

"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."

The court may order the commitment of a person whom the court has found, on clear and convincing evidence, to be a mentally ill person if, in the opinion of the court, the person is unwilling or unable to participate in treatment, and the person does not qualify for conditional release. ORS 426.130(1)(b)(C). Whether a person may be committed is determined by his or her condition at the time of the hearing, with the person's history providing context. *State v. Woolridge*, 101 Or App 390, 394, 790 P2d 1192, *modified on recons*, 102 Or App 559, 794 P2d 1258 (1990).

■■ In the present case, the parties agree that appellant has a mental disorder. The state concedes that he is not dangerous to himself or unable to meet his own basic needs, and appellant does not argue that he would voluntarily seek necessary treatment. Thus, the only issue before us is whether, at the time of the hearing, appellant was dangerous to others. We examine the record *de novo, State v. Bodell*, 120 Or App 548, 550, 853 P2d 841 (1993), but we give some deference to

the trial court's findings if they are based on that court's "opportunity to view [the] appellant's demeanor," which "may be critical in reaching a conclusion as to his mental state." *State v. Furnish*, 86 Or App 194, 198, 738 P2d 607 (1987), *quoting State v. Smith*, 71 Or App 205, 212 n 8, 692 P2d 120 (1984) (internal quotations marks omitted). We note further that actual violent acts are not required to establish dangerousness, if there is "ample evidence to form a foundation for predicting future violent behavior." *Bodell*, 120 Or App at 550 (citation and internal quotation marks omitted).

Under those standards, we find this to be a close case. Significant evidence and testimony in the record support the trial court's finding. Appellant's threats were, as noted, credible. They were also repeated. Further, although appellant achieved considerable insight into his condition by the time of his hearing, he was unwilling or unable to reject the possibility that he was, indeed, chosen by God to prevent the end of the world. His improved condition at his hearing likely resulted from his course of medication, yet he acknowledged that he needed help in monitoring that treatment. His actions when denied a shower indicate a potential for violence. One mental health examiner believed appellant's thinking to be logical only on the surface; another had no doubt that he was dangerous. Significantly, the trial court observed that, when talking about his wife and his apparent resentment of her "distrust," appellant spoke with an "edge" to his voice. That is the kind of observation, unobtainable from reading a cold transcript, to which we owe some deference.

■ We are persuaded, however, that a contrary outcome is warranted. Appellant had no history of prior manic episodes. Despite apparently credible threats, appellant attempted no violence; when he needed to be restrained in the hospital, it was not because he was in the process of trying to act out his delusional role but because he was denied the opportunity to shower. At the time of the hearing, he was lucid, his thoughts were organized, and his affect was normal. One mental health examiner deemed him to be harmless. Further, his belief that he was chosen by God to heal an imperfect world differed in degree, but not in kind, from similar beliefs held by perfectly sane adherents to traditional

religions, not to mention prophets, oracles, seers, saints, and other generally venerated figures in traditional apocalyptic religious literature; by itself, such a belief does not justify the significant loss of liberty imposed by involuntary mental commitment. In short, the record supports the conclusion that appellant underwent a single decompensation brought on by fatigue and stress, during which he made a few ultimately idle threats. Seen in that light, the evidence that appellant was likely to repeat those threats and actually carry them out—that, in other words, he was a danger to others—is not clear and convincing.

Reversed.