196 P.3d 30 (2008)
223 Or. App. 476
In the Matter of K.S., Alleged to be a Mentally III Person.
STATE of Oregon, Respondent,
v.
K.S., Appellant.
061070509, A134072.
Court of Appeals of Oregon.
Submitted May 16, 2008.
Decided October 29, 2008.
*31 Lance D. Perdue, Portland, filed the brief for appellant.
Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Jeff J. Payne, Assistant Attorney General, filed the brief for respondent.
Before HASELTON, Presiding Judge, and ARMSTRONG, Judge, and ROSENBLUM, Judge.
ROSENBLUM, J.
The trial court committed appellant to the custody of the Mental Health Division after finding that, because of a mental disorder, he is a danger to himself and others. ORS 426.005(1)(d)(A); ORS 426.130. On de novo review, State v. North, 189 Or.App. 518, 520, 76 P.3d 685 (2003), we conclude that there is sufficient evidence to support the conclusion that appellant is a danger to others. Because we affirm the trial court on that basis, we do not reach the question of whether appellant is a danger to himself.
We take the following facts from the record. Although we do not reach the question whether appellant is a danger to himself, some of the evidence that supported that ground for the trial court's decision is pertinent to whether appellant is a danger to others. We therefore include that evidence in our recitation of the facts.
Appellant immigrated to the United States with his family as a young child. At the time of the commitment hearing, on October 26, 2006, he was 26 years old and lived primarily with his parents but sometimes stayed with one of his sisters. In approximately 1999 or 2000, appellant began exhibiting symptoms of schizophrenia, including paranoia, delusions of persecution, and auditory and visual hallucinations. Appellant believes that some of his hallucinations are real; he acknowledges that others are voices in his head.
Around the time he began exhibiting symptoms, appellant physically attacked one of his sisters, although the record does not indicate the nature of the assault or whether she suffered any injuries. In 2000, he was hospitalized in a psychiatric unit for about a week and was prescribed Risperidal. The medication helped diminish his symptoms to a degree but did not stop them altogether. Appellant stopped taking the medication about two months before the hearing, claiming concerns about side effects. His family attempted to convince appellant to resume taking the medication, but he refused. Appellant told the precommitment investigator that he sometimes uses alcohol and that it helps with the auditory hallucinations, but his sister testified that his behavior is worse when he drinks.
Appellant believes that people, both strangers and family friends, frequently direct racial slurs at him.[1] For example, he also believes that his sisters' boyfriends come to the family's home and make racist comments to him when no one else is listening. Not long before the hospitalization leading to this commitment proceeding, appellant physically confronted the boyfriend of one of his sisters, requiring one of his parents to step in between the two men to prevent any escalation. *32 At the hearing, appellant acknowledged having threatened to assault the boyfriend. Appellant told the precommitment investigator that he "wanted to scare him for what he did."
Appellant's relationship with his family was very strained. He expressed considerable frustration and anger that no one in the family believed that he was being persecuted, often punching the walls and doors in the house. His family feared that he would harm them if he remained in the home without taking his medication. In early October 2006, appellant got into a fight with his family and left the house for a few days, sleeping under a bridge. On October 12, shortly after he returned home, he was intoxicated and had an angry outburst in which he punched a hole in one of the walls and destroyed property in the back yard. His parents were terrified and called the police. When the police arrived, appellant told one of the officers, "[G]o ahead, shoot me. Do it. I don't care." Appellant was placed on the hospital hold that led to this commitment proceeding. Neither appellant's sister nor his parents will allow him to live with them again unless his condition improves.
Once in the hospital, appellant was treated with antipsychotic and anti-anxiety medications. On October 18, six days after appellant was hospitalized, the precommitment investigator obtained a two-week "diversion from commitment," asserting that appellant would continue to be treated with medication.[2]
Appellant's sister visited him at the hospital. He told her that he "didn't care about anything anymore, and that basically he was tired of people doing what they were doing, [that is,] talking about him and conspiring against him and he just didn't care about what happened to him anymore." He also told her that "the staff and the other patients there [were] talking about him," and that he was "tired of it" and "just really sick of it. And that if he could do something, he would."
The diversion was unsuccessful and ended early. On October 22, four days after the diversion was ordered, appellant came to believe that another patient had poisoned him with snake venom in a hospital recreation room. According to appellant, he was having trouble breathing, and the other patient began flicking his tongue in and out like a snake to indicate that he had poisoned appellant. He responded by flipping over a table and throwing a chair at it, breaking the table. The commitment hearing was held four days later.
Appellant has limited insight with respect to his mental illness. Before the hearing, appellant alternately acknowledged and denied that he is schizophrenic. At the hearing, while his sister was testifying, appellant vehemently denied that he suffers from a mental disorder. Later, during his own examination, he again stated, "I don't have a mental illness," but then immediately acknowledged that he hears voices and that his medication helped reduce them to "whispering." Appellant asserted that he could distinguish between hallucinated voices and real ones, although he was adamant that the racist remarks that he hears are real.
Before the hearing, appellant told the precommitment investigator that the voices in his head wanted him to "do something bad," though he did not know precisely what. At the hearing, he stated at one point that the voices "giv[e] me clues or something" but that he did not remember specifically what they said. At another point, he said that he had flipped over the table and thrown the chair in the hospital because he thought that the voices in his head wanted him to do it because he had "walked away so many times" before, adding, "You don't understand how many times I've walked away from situations like that." He went on to say,
"Yeah, so that'sthat's why I thought I had to do that, you know, because it kept on getting worser and worser and worser. You know, for the first like what, two or three years, it was just name calling. After that they came in the house and started doing that, you know."
*33 Much of the evidence at the commitment hearing concerned appellant's belief that he is a victim of racism and other persecution. One of appellant's sisters testified that she had never heard anyone make any racist remarks toward appellant. The court asked appellant if he could not simply ignore the racist comments. Appellant replied, "I have been ignoring it. That's what I'm telling you. I've been ignoring it for so long that afterafter theytheythey started coming into the house and started doing it, you know. They're really like pissing me off, you know."
The court asked appellant whether he thought his family let people into the house to make racist statements to him. Appellant said that they continued to allow his sisters' boyfriends in because they did not believe that the boyfriends made racist comments. When the court stated that it found it odd that racists would come to the family's home, appellant stated, "No, they just wantthey want to put me in jail. That's what they want to do. And I already told them, if you guys want to harm me, go ahead and do it right now and put me in jail. I don't care." The court asked, "[W]hy would they want to put you away?" Appellant responded,
"I don't know. They just wantokay. They might thinkthey think that I'm probably dealing cocaine or some butI'm just a big drug lord or I killed somebody or I killed many people or something. They probably think that. Well, I didn't do that. It was all a lie."
Later in the hearing, one of the examiners asked appellant why he had destroyed property when he thought he had been poisoned instead of asking a doctor or someone on the staff to help him. Appellant answered, "They don't want to help me in the beginning, why would I ask them for help if I can't get it?" The following exchange ensued:
"Q Why act out? Why destroy property and threaten?
"A Because I was furious. After what happened andso you wouldn't do nothing if someone did that to you?
"* * * * *
"Q * * * [Y]ou were put in that situation, but you chose to fight at that point, as opposed to seek help. So that leads me to believe that [if] you get into that situation again, which may happen, you will fight. You will protect yourself, and that concerns me that you may get hurt.
"A You know what? I've already been hurt and there's nothing more you guys can do to me. I'm already mentally insane because of you guys."
The examiner told appellant that he was concerned that, if appellant acted out in that way, other people might misunderstand what he was experiencing and might hurt him. Appellant asserted that, when people call him names on the street, he does not respond:
"They call me it so much I don't even confront them about it, you know. I just keep on walking, just do my own thing. And
"Q What if they're trying to poison you, more than name-call?
"A Well, if they're trying to poison me, what do you think is going to happen if they poison me? I'll probably die orif I don't die, I'll probably get some help, but I'mor, you know, I'll be really angry. But this time, you know, I learned not to flip over tables or break chairs. I mean, that's what I thought they wanted me to do, the voices, the people, whoever they are."
The court asked appellant about having told the police to "go ahead, shoot me." Appellant stated,
"I mean, what elsewhat else can I do when they've been prosecuting [sic] me for like five or six years, you know. What else could I do but act out and likelike, I don't knowI don't know how to explain it. I mean, if they don't want me to get violent, then why do they keep on doing it to me. Because I done nothing but show peace ever since they, you know, started."
The court stated, "Well, but you know we've been a little bit worried in these last few months in these counties around here. We've had some people acting out with the police and they're going to get themselves killed. That worries me." Appellant replied, *34 "Well, I mean, my life is over, you know. There's nothing I can do now, you know."
At the conclusion of the hearing, both of the examiners opined that appellant is a danger to himself because he misunderstands other people's intentions and is likely to create confrontational situations where people will harm him in retaliation for his statements and actions. Examiner Mohler also opined that, for essentially the same reasons, appellant is a danger to others. The court found that appellant suffers from a mental disorder and that he was not stable as of the time of the hearing. In the court's view, because appellant's "delusional system remains firmly in place, quite strongly anchored, that if he does return home, * * * certainly the confrontations are going to continue and * * * the meetings with the police are going to continue." The court also found that appellant has a history of noncompliance with medical treatment and that, if discharged, he would not voluntarily continue to take prescribed medication. The court concluded that appellant is dangerous to himself and others, and it ordered that he be committed.
On appeal, appellant assigns error to the trial court's finding that he is mentally ill, challenging the sufficiency of the evidence in support of that finding. With respect to the issue of whether he is a danger to others, appellant acknowledges that he threatened his sister's boyfriend, but he argues that there is no evidence that actual future violence was highly likely. He argues that his conduct involving furniture at the hospital does not indicate violent intentions, noting that he told the trial court that he had learned not to do that again. Appellant points out that his only violent behavior toward a person was the attack on his sister, which was at least six years before the hearing. With respect to whether he is a danger to himself, appellant asserts that the state adduced no evidence of a pattern of taking actions leading to self-destructive conduct.
The state responds that the record supports the trial court's judgment. The state points out that appellant continues to believe that many of his hallucinations are real, including a fellow patient poisoning him with snake venom. The state also notes that appellant's perception of the insults and threats against him has escalated over time and that, in the months prior to his commitment, after he quit taking his medication, his responses to his delusions escalated as well. The state argues that a court need not wait until a person actually injures someone before determining that he or she is a danger to others. In the state's view, appellant also made a number of statements indicating that he is suicidal.
We begin by considering whether clear and convincing evidence in the record supports commitment on the ground that appellant is a danger to others. See ORS 426.130(1)(b) (involuntary commitment requires clear and convincing evidence that the person is mentally ill); ORS 426.005(1)(d) (defining "mentally ill person" as a person who, because of a mental disorder, is dangerous to self or others or unable to provide for basic personal needs). The "clear and convincing" standard requires evidence of extraordinary persuasivenessthat is, evidence establishing that the truth of the facts in issue is highly probable. State v. M.L. F., 220 Or.App. 629, 634, 188 P.3d 368 (2008). There is no dispute that appellant suffers from a mental disorder. The question in this case is whether the evidence establishes that he is a danger to himself or others. That question turns on whether the record furnishes a foundation for predicting future violent behavior. State v. P. B., 216 Or.App. 184, 190, 171 P.3d 1042 (2007), rev. den., 344 Or. 671, 189 P.3d 26 (2008).
We conclude that the evidence on this record is sufficient to establish that appellant is a danger to others. The record shows that, when appellant first began to exhibit symptoms of schizophrenia, he assaulted his sister. It also shows that, in the time leading to appellant's hospitalization, both his perception of persecution and his frustration with and inability to tolerate it were mounting. Appellant believed that ignoring his persecutors only caused the problem to get worse. He also said that he had been ignoring the name-calling in public places for so long that "they started coming into the house *35 and started doing it," adding, "They're really like pissing me off, you know." Although appellant told the court that he did not confront people who called him names in public, he aggressively confronted the boyfriend of one of his sisters, threatening to "kick his ass," and one of his parents had to bodily intervene.
When he was in the hospital, appellant told his sister that he was "just really sick of" people talking about him and that, "if he could do something, he would." Appellant told the court that he had destroyed property at the hospital because he thought that the voices in his head wanted him to do it because he had "walked away from situations like that" so many times before. He thought he had to act out because "it kept on getting worser and worser and worser."
Appellant also told the court that he believed that the police had persecuted him for five or six years and indicated that he could no longer put up with it, stating, "What else could I do but act out[?] * * * [I]f they don't want me to get violent, then why do they keep on doing it to me[?]" When the police took appellant to the hospital, he acted very provocatively, telling them to shoot him.
Appellant had difficulty controlling his anger toward his family because they did not believe that he was being persecuted. His sister testified that appellant's behavior was worse when he had been drinking, but she said that, in the two months before the commitment hearing, she had witnessed "incidents of him being dangerous when he's not intoxicated," emphasizing that "he gets very angry. He gets very angry." Appellant's parents finally called the police out of fear for their safety when, in an angry outburst, he punched a hole in a wall and destroyed property in the back yard.
On several occasions, appellant demonstrated disregard for his own fate. He told his sisters' boyfriends that he did not care if they put him in jail. He told the police that he did not care if they shot him. In the hospital, he told his sister that "he just didn't care about what happened to him anymore." Finally, he told the court, "[M]y life is over, you know. There's nothing I can do now, you know." Appellant's provocative conduct involving his sister's boyfriend and the police suggest that his attitude toward his own fate contributed to his greater willingness to confront those who he believed were persecuting him.
All of the mental health professionals who had contact with appellant immediately before and at the commitment hearingthe doctor who placed him on the hospital hold, the precommitment investigator, and the examiners at the hearingagreed that appellant had poor impulse control and impaired judgment. The investigator described those qualities in appellant as "impaired to a dangerous degree by his paranoia and delusions." The examiners were concerned that appellant would act out in response to his hallucinations and would either harm other people or be harmed by someone whom he confronted.
Finally, the people who knew appellant besthis familyfeared for their safety if appellant remained in the home without taking his medication.
To summarize, appellant's history shows that, when he does not take his medication, he is prone to violent behavior. When appellant first began to experience symptoms of schizophrenia, before he was prescribed medication, he assaulted one of his sisters. After he stopped taking the medication, he confronted one of his perceived persecutors in a way that could have become violent but for the bodily intervention of one of his parents. He destroyed property at his parents' home and in the hospital. Appellant's conduct and threats of violence, viewed in the context of his perception that his persecution was becoming worse, his growing unwillingness to tolerate the perceived affronts, and his disregard for his own fate, establish a foundation for predicting future violent behavior. The trial court was not required to wait until appellant actually harmed someone before finding him to be a danger to others.[3]See State v. King, 177 Or.App. 373, 377, 34 *36 P.3d 739 (2001) (commission of an overt violent act is not a prerequisite to a prediction of future dangerousness). For those reasons, we agree with the trial court's conclusion that, at the time of the hearing, appellant was a danger to others and, thus, was mentally ill within the meaning of ORS 426.005(1)(d).
Affirmed.
NOTES
[1] At the outset, we acknowledge that perceptions of race-related persecution are not, in and of themselves, a basis for diagnosis of a mental illness or a finding of a mental disorder. In this case, however, the nature of appellant's mental illness, chronic paranoid schizophrenia, leads appellant to suffer from auditory hallucinations. The record does not establish definitively that none of the insults was real. However, the findings from the precommitment investigation report stated that appellant suffered from "[d]elusions of persecution." Thus, we proceed under the assumption that, in this case, the racial slurs perceived by appellant are, at least in part, a product of his mental disorder.
[2] The state filed a "certificate for diversion from commitment" in the trial court, asking that appellant's commitment hearing be postponed for 14 days, during which time appellant would participate in treatment for mental illness.
[3] Because we agree with that basis for appellant's commitment, we need not address whether he was a danger to himself.