No. 74        February 5, 2025        629

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of J. K.,
a Person Alleged to have Mental Illness.

STATE OF OREGON,
*Respondent,*

*v.*

J. K.,
*Appellant.*

Marion County Circuit Court
23CC06173; A182766

Michael Y. Wu, Judge pro tempore.

Submitted November 8, 2024.

Christopher J. O'Connor and Multnomah Defenders, Inc. filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jordan R. Silk, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.

JOYCE, J.

Affirmed.

**JOYCE, J.**

Appellant appeals from a judgment involuntarily committing him to the custody of the Oregon Health Authority based on the trial court's finding that, as a result of a mental illness, he is a danger to others. *See* ORS 426.130(1)(a)(C); ORS 426.005(1)(f)(A). Appellant raises two assignments of error. First, appellant contends that the evidence was insufficient to demonstrate that, because of his mental disorder, he presents a danger to others. Second, appellant argues that the trial court plainly erred when it failed to enforce applicable statutes and rules regarding the mental health examiner's role in his civil commitment proceeding and the examiner's report. Because the record was legally sufficient to support the trial court's conclusion and because the trial court did not commit plain error with respect to enforcing the applicable statutes and rules, we affirm.

We begin with appellant's first assignment of error, in which he argues that the evidence was insufficient for the trial court to determine that, at the time of the hearing, appellant was a danger to others. When reviewing a civil commitment determination, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *State v. M. A.*, 276 Or App 624, 625, 371 P3d 495 (2016) (standard for non-*de novo* review; internal quotation marks omitted). We state the facts in accordance with that standard.

While appellant was living in Alaska, he experienced a mental health crisis that resulted in his hospitalization there. Appellant's mother flew to Alaska to bring him back to Oregon, and, when she arrived there, she noticed that appellant was "not acting normal." In particular, he was saying things that "d[id]n't make sense" and claiming that he "want[ed] to kill everybody."

On the plane ride back to Oregon, appellant exhibited aggressive behavior. Appellant's mother had to be "quiet and agree [on] everything with him," or he would "start

screaming" and "hitting the walls." People on the plane assisted appellant's mother in calming him down and tried to "make sure nobody looked at him." If someone did look at him, appellant would say "Why are you watching me? I will kill you."

Back in Oregon, appellant continued to exhibit aggressive behavior, including hitting himself and the wall. Appellant also began making "constant statements to kill himself and kill his mother, step-father, and younger siblings." In one instance when appellant threatened to kill his mother, he "walked up to her face" while screaming that he wanted to choke her and used his hands to "suggest how he would do it." In response, his mother ran away and locked herself in her bedroom. At the same time, appellant periodically expressed concern about his own condition. At one point, at his mother's suggestion, appellant agreed to go to the hospital, where he acknowledged his repeated threats to kill others and asked for help.

While at the hospital, appellant was placed on a physician's hold and detained for the civil commitment investigation. That hold led to this commitment proceeding.

At the civil commitment hearing, the court heard testimony from a number of witnesses, including appellant's treating psychiatrist, appellant's mother, the civil commitment investigator, and appellant himself. The first witness was appellant's treating psychiatrist, Dr. Costa, who had treated appellant for the three days leading up to the hearing. Costa opined that appellant suffered from psychotic disorder unspecified. While at the hospital, appellant had been receiving antipsychotic medication. Although appellant was "not keen on taking medications," appellant had been "cooperating with them" in the hospital setting. Costa did not believe that appellant would comply with any outpatient treatment because appellant "doesn't believe there's anything wrong with him" and thinks "everyone else around him has a mental illness." Costa also opined that appellant's mental disorder made him a danger to others. He explained that "if [appellant is] misperceiving his environment, he becomes paranoid to the degree of feeling threatened and *** then threatening others in turn."

The civil commitment investigator, de Obaldia, testified that appellant had a mental disorder and that, as a result of his mental disorder, appellant was a danger to others. He explained that his opinion was based on conversations he had with medical staff at the hospital and appellant's mother, as well as on his own interaction with appellant. During an interview that de Obaldia had with appellant, appellant endorsed homicidal thoughts and became aggressive toward him. More specifically, de Obaldia testified that, as he "was trying to explain to [appellant] the procedures" related to his upcoming hearing, appellant said, "I feel like I'm going to kill you right now." At that point, de Obaldia "thought it best not to proceed with the interview."

During de Obaldia's testimony, the court received his pre-commitment investigation report. According to that report, appellant displayed threatening behavior on two other occasions while at the hospital. In one incident, appellant became agitated with hospital staff, and he threatened that he was going to "kill [a nurse] with blood on the floor." Three security officers and two nurses assisted in calming appellant down. The report also described a second incident, during which appellant ran into the day area of the hospital and "threatened to punch people." Following the second incident, appellant was placed in seclusion where he started "pounding and kicking the walls." After both incidents, appellant was given additional medication to subdue his "severe agitation and threats of violence."

Finally, appellant testified that he did not believe that he had a mental illness or that he needed to take medication after leaving the hospital. Although appellant stated that his "parents were definitely in the right for dropping [him] off" at the hospital, he also stated that "the truth is *** I don't need any help." Appellant acknowledged that he threatened to kill his mother, but he stated that he was "not going to hurt her." He also testified that if he was not released, he was "just going to get more threatening. [He was] just going to get more worse. [He was] not going to be able to keep [his] shit together."

After hearing the evidence, the trial court determined that appellant had a mental disorder (*i.e.*, psychotic

disorder unspecified) and that, as a result of his mental disorder, he presented a danger to others. The court reasoned that there was a nexus between his mental illness and the danger that he presented to others because his disorder caused him to "misperceiv[e] his environment around him, feeling threatened and then acting out on that and making threats to not just physically harm people, but to kill them." Thus, the court concluded that the numerous death threats that appellant had made against others "establish[ed] a dangerousness to the standard necessary" and that "the overlap between [his threats] and his psychosis *** makes it not just conjecture" that he is dangerous to others.

On appeal, appellant does not challenge the trial court's conclusion that he has a mental disorder. Rather, he argues that the state failed to present clear and convincing evidence that, as a result of that disorder, he was a danger to others. *See* ORS 426.130 (a person may be committed upon proof that a person has a mental illness); ORS 426.005(1)(f)(A) (a person with a mental illness includes someone who, because of a mental disorder, is a danger to others). Although appellant acknowledges that he made numerous threats to kill others, he contends that because "no threats were followed by any action" the record is insufficient to establish that he is a danger to others. The state responds that, because appellant's repeated direct threats to kill specific individuals were coupled with behavior that was "escalating toward violence," the record provided a sufficient evidentiary basis from which the trial court could predict future dangerousness. We agree with the state.

In determining whether a person poses a danger to others, we assess "whether the evidence presented was sufficient to prove that a person is a danger to others as a result of his condition at the time of the hearing as understood in the context of his history." *State v. M. R.*, 225 Or App 569, 574, 202 P3d 221 (2009) (internal quotation marks omitted). A person can be committed on "danger to others" grounds only if the evidence permits a rational finder of fact to conclude that a mental disorder makes the person "highly likely to engage in future violence toward others, absent commitment." *State v. S. E. R.*, 297 Or App 121, 122, 441 P3d 254

(2019). Thus, for a court to find that a person is dangerous to others, the state must prove that "actual future violence is highly likely." *State v. L. D.*, 247 Or App 394, 400, 270 P3d 324 (2011). As we have previously explained, that will generally require the state "to provide evidence that shows that the appellant's threats of future violence are accompanied by an overt act demonstrating an intention and ability to carry out the threats or other circumstances indicating that actual future violence is highly likely." *State v. L. R.*, 283 Or App 618, 625, 391 P3d 880 (2017). We conclude that the evidence is sufficient to meet that standard.

The incident in which appellant threatened to choke his mother was a threat of serious physical violence coupled with an overt act of violence (coming at his mother while demonstrating how he would choke her). His mother's reaction of running away and locking herself in her bedroom indicates that she also believed that her son truly intended to seriously harm or kill her and that he was capable of following through with his threat. As such, his mother's description of the incident was sufficient to establish an express threat of serious physical harm accompanied by an overt act of violence.

Furthermore, the record reflects that the choking incident with his mother was not an "'isolated occurrence'" of violence. *State v. A. M. R.*, 236 Or App 186, 191, 235 P3d 720 (2010) ("The state may rely on past violent acts to show future dangerousness so long as 'there is no indication that such violence is an isolated occurrence.'" (Quoting *State v. S. D. M.*, 198 Or App 153, 158, 107 P3d 683 (2005).)). In the two weeks leading up to his civil commitment hearing, appellant threatened to kill several specific people with whom he was interacting, including his family members, other passengers on the airplane, a nurse at the hospital, and de Obaldia. *Compare State v. T. M.*, 296 Or App 703, 711, 437 P3d 1197 (2019) (concluding that an isolated occurrence of violence was insufficient to establish that the appellant was a danger to others where there was no evidence that the appellant had engaged in any other violent acts or threatened anyone else). The escalating frequency and intensity of appellant's death threats, taken together with his physical aggression (including hitting himself and the walls), his

lack of insight into his mental condition, and his overt act of violence (the choking incident) establish a foundation for predicting future violent behavior. *See State v. K. S.*, 223 Or App 476, 486, 196 P3d 30 (2008) (concluding that "[t]he trial court was not required to wait until [the] appellant actually harmed someone before finding him to be a danger to others"). In other words, there was evidence that the choking incident was part of a larger pattern of appellant's mounting tendency toward violence. In sum, the evidence was sufficient to allow the factfinder to find, by clear and convincing evidence, that appellant was a danger to others at the time of the hearing and, thus, was a person with mental illness within the meaning of ORS 426.005(1)(f)(A).

We turn to appellant's second assignment of error in which he claims that the trial court plainly erred when it failed to enforce the applicable statutes and rules regarding the mental health examiner's role in his civil commitment proceeding and the examiner's report. Appellant's claim of error is not preserved, so he requests plain-error review. *See State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013) (an error is "plain" when it is an error of law, the legal point is obvious and not reasonably in dispute, and the error is apparent on the record without having to choose between competing inferences.).

Appellant contends that the trial court plainly erred by failing to "strictly enforce the statutory framework for the examiner" and by "allowing the examiner to opine without the examiner having begun the examination prior to the hearing and by failing to require the examiner to conduct the statutorily and OAR-required inquiries and examination." Appellant points to seven different purported deficiencies; we address each in turn.

First, appellant contends that he was denied the procedural protections contained within ORS 426.075(2), which states that the court "shall appoint examiners under ORS 426.110 sufficiently in advance of the hearing so that the examiners may begin their preparation for the hearing." Here, the record shows that the order appointing the examiner was signed the day before the civil commitment hearing and that the examiner had slightly more than 24 hours to

prepare. To the extent that appellant argues that the examiner's appointment timeframe was insufficient under ORS 426.075(2), we conclude that the error is not plain because it is not obvious that the trial court's appointment of the examiner failed to meet the statutory requirements of that provision. In other words, it is not obvious that an examiner, who was appointed slightly more than 24 hours before a civil commitment hearing, was not appointed "sufficiently in advance of the hearing." ORS 426.075(2).

Second, appellant asserts that the trial court plainly erred in failing to enforce a different portion of ORS 426.075(2), which requires that the medical records from the current hospital and the investigation report "shall be made available to the examiners at least 24 hours before the hearing in order that the examiners may review the medical record and have an opportunity to inquire of the medical personnel concerning the treatment of the person alleged to have a mental illness during the detention period prior to the hearing." In arguing that the trial court plainly erred, appellant relies on there being "no indication" in the record as to when appellant's medical records were made available to the examiner or as to what the examiner did to prepare for the hearing. Appellant's argument is untenable because it is inconsistent with the framework of plain-error review. As we have previously explained, "[w]e cannot find plain error based on speculation in the face of a silent record." *State v. C. T.*, 333 Or App 718, 722, 553 P3d 1070 (2024).

Third, appellant argues that, to the extent that the examiner did conduct a portion of the examination before the hearing and without allowing appellant's counsel to be present, appellant was denied the procedural protections contained in ORS 426.100(3)(f), which allows counsel to be present at the examination. In arguing that the trial court plainly erred to enforce appellant's right to have counsel present at the examination, he again relies on there being "no indication of whether the appellant had counsel for any 'examination' and no indication that [he] waived his right to counsel at the examination." As we just explained, because the alleged error must be apparent on the record, appellant's argument is incompatible with plain-error review.

Fourth, appellant argues that the trial court plainly erred when it failed to enforce the terms of ORS 426.120(1)(b), which requires the examiner to "initiate the examination process prior to the hearing." Appellant contends that it is reasonable to infer that the examiner did not begin the examination process prior to the hearing as required by ORS 426.120(1)(b) based on the fact that there is "no indication" in the examiner's report that the examiner interviewed appellant prior to the hearing or made any visual observation of appellant outside of the hearing. Assuming without deciding that the record allows us to reasonably make that inference, ORS 426.120(1)(b) expressly states that "[a]ny failure to comply with this paragraph shall not, in itself, constitute sufficient grounds to challenge the examination conducted by an examiner." Thus, any error is not plain.

Fifth, appellant argues that he was deprived of the procedural protection contained in OAR 309-033-0950,[1] which requires the examiner to "conduct an examination in a manner that elicits the data necessary for establishing a diagnosis and a plan for treatment." In support of his argument, appellant once more relies on there being "no indication in the record that the examiner conducted an examination that established a plan for treatment." Because the appellant's alleged error is not apparent on the face of the record, any error is not plain.

Sixth, appellant argues that the trial court plainly erred when it did not enforce the examiner's obligations under ORS 426.120(2)(a), which required the examiner's report to "include a recommendation as to the type of treatment facility best calculated to help the person recover from mental illness." In response, the state contends that the trial court did not plainly err because the examiner's report did make a treatment-facility recommendation. Indeed, the examiner's report states that appellant "would not cooperate with and benefit from a program of voluntary treatment" and recommends that appellant is "best treated in an inpatient psychiatric facility." We agree with the state that it is not obvious that the examiner's recommendation that

---

[1] OAR 309-033-0950 has been amended since appellant's civil commitment hearing; however, because those amendments do not affect our analysis, we cite the current version.

appellant receive treatment from "an inpatient psychiatric facility" fails to comply with ORS 426.120(2)(a).

Finally, appellant argues that the examiner failed to conduct the "mental status examination" and "psychosocial history" that OAR 309-033-0960(2) requires.[2] Although the examiner's report does contain findings resulting from the examiner's mental status examination and psychosocial history, appellant contends that the examiner's mental status examination was insufficient because the report "lacks any indication" that the examiner considered all of the factors relevant to those assessments. Because the record is silent as to whether the examiner considered any indicators outside of the ones that are mentioned in the report, appellant's alleged error is not apparent on the face of the record and any error is not plain.

Affirmed.

---

[2] OAR 309-033-0960 has been amended since appellant's civil commitment hearing; however, because those amendments do not affect our analysis, we cite the current version.