Submitted April 14, 2015, reversed October 19, 2016

In the Matter of S. R. J.,
a Person Alleged to have a Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

S. R. J.,
*Appellant.*

Deschutes County Circuit Court
14MH0003; A156553

386 P3d 99

Garrett A. Richardson and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Patrick M. Ebbett, Assistant Attorney General, filed the brief for respondent.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

FLYNN, J.

Appellant seeks reversal of an order committing her involuntarily to the Oregon Health Authority for up to 180 days on the basis of a mental disorder that, the trial court determined, makes appellant dangerous to herself and others. *See* ORS 426.130(1)(a)(C), (2). Neither party has requested that we review this matter *de novo*, and we conclude that this is not an "exceptional" case that warrants *de novo* review. *See* ORAP 5.40(8)(C) (providing that the court will exercise its discretion to review *de novo* "only in exceptional cases"). Thus, "'we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome.'" *State v. M. A.*, 276 Or App 624, 625, 276 P3d 624 (2016) (quoting *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013)). Reviewing under that standard, we conclude that the record is legally insufficient to meet the rigorous threshold that our case law requires to justify an involuntary civil commitment. Accordingly, we reverse the order of commitment.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant was 54 years old at the time of the hearing. Dr. William Campbell, a psychiatrist, treated appellant during a five-day period in which she was hospitalized immediately prior to the hearing. He testified that she suffers from "Bipolar I disorder, possibly schizoaffective disorder, but most likely Bipolar I." Campbell reported that appellant has "significant delusions that are quite grandiose, religious in nature" and that "[s]he tends to be paranoid at times."

For example, Campbell testified, when appellant first arrived at the hospital, "she was claiming that she was God. Then she began to claim that she was Mary Magdalene," a biblical figure. He added that, after starting to take some medication, appellant "had periods where she still claim[ed]

---

[1] Appellant also appeals from an order prohibiting her from purchasing or possessing a firearm. Because that order is dependent upon the court's determination that appellant is a danger to herself or others, and because we reverse that determination, we also reverse—without further discussion—the order prohibiting appellant from possessing a firearm.

that [she was] an agent of God here to wipe out zombie souls who are encased in pedophiles and other people who hurt children." The morning of the court hearing, appellant "said that her mission was to kill the rapists and pedophiles" and that "she felt God was placing her in the courtroom so she could kill all of the—those people."

Campbell also testified that, while in the hospital, appellant "had numerous episodes with the nursing staff and the mental health workers on the unit where she rushes at them, begins to scream at them, talking about killing them because they're evil; they have zombie souls." He emphasized that "[s]he has not actually hit anyone since coming into the unit—since coming into the emergency room. But she postures and becomes very threatening. It's hard to tell if she's not going to impulsively strike someone."

Appellant's delusions are not new. During an encounter with police four months before the hearing, appellant "began calling herself Mary Magdalene and stated that she was not of this earth and from the planet Jupiter," and, when asked a question, "regardless of what the question pertained to, her response was 'baby's blood.'" That encounter began when two officers responded to a call that appellant had been standing in the middle of a "very busy road" at a "very busy time of day" and "attempting to direct traffic." One of the officers testified that appellant was standing in the turn lane on the east side of the intersection and that traffic "was backed up in all directions" because "everyone at every corner of the intersection was stopped and watching" appellant. Appellant initially refused to comply with the request to step to the side of the road, responding that "she didn't have to because she was in the crosswalk." After eventually agreeing to come to the side of the road, appellant ran away from the officers and "again began walking in the middle of the lane of traffic." Appellant engaged in a "slight struggle" with, and "tried to run past," one of the officers. At that point, the officers stopped appellant and placed her in handcuffs. She became "very upset" and started "screaming within a matter of inches from" the face of one of the officers. The officers placed appellant in a patrol car and took her to the hospital. Appellant was given medication that allowed

her to "recompensate[] fairly well" and leave the hospital, but she did not continue taking her medication.

Appellant's most recent hospitalization also began with an incident involving traffic. The Bend Police Department received a report that she was "standing near an intersection" and "screaming and yelling at passing vehicles." When the testifying officer arrived, appellant was seated between a brick wall and the roadway at a "corner of a roundabout" and speaking with another officer. The other officer reported that appellant had been "snarling and barking" at him and told him her name was "Katniss Everdeen"—a character from a popular book and movie series. At that point, the officers decided that appellant "was a danger to herself or others" and decided to put her in handcuffs. She resisted by becoming "dead weight," and, when the officer pulled appellant's arm to put it in the handcuff, appellant "showed her teeth." One of the officers testified that while appellant waited for the officers to try to identify her, "[S]he sat and just kind of rocked back—or forward and back, and was repeating what essentially was, 'Save the children. Jesus, help me save the children * * *.'" When officers decided to take appellant to the hospital, she tried to resist being placed in the police car by bracing her foot against the doorjamb and kicking her feet.

After being transported to the emergency department of St. Charles Medical Center, appellant quietly talked in the hospital bed until a nurse asked for a urine sample. After appellant refused to provide a urine sample, the nurse began to insert a catheter, and appellant "crossed her ankles and basically locked her legs out and refused to comply in any way, shape, or form." Mayernik, one of the security officers, testified that "it took [two of them] basically prying her ankles apart to begin" the catheterization. When security officers started to handcuff appellant's hands to the bed so that she would be unable to resist the catheter, appellant attempted to bite, kick, and punch them.

Later, staff attempted to change appellant into scrub pants and a shirt before moving her to the hospital's psychiatric unit. Appellant resisted, so Mayernik again forcibly separated her ankles. In response, appellant again

attempted to punch and bite him and finally kicked him in the chest. Mayernik experienced some subsequent soreness and bruising from the kick. During transport to the psychiatric unit, appellant tried to use her legs to stop the staff from moving her gurney.

Apart from those encounters with law enforcement and hospital staff, the state presented testimony about a recent incident in which appellant entered a neighbor's home without being invited to do so, walked through the house and came out to a back deck where the neighbor was talking with some other people. Appellant introduced herself, the group moved back inside the house, and appellant left without saying anything more. The neighbor was acquainted enough with appellant to recognize her as a neighbor but had spoken to appellant only once before.

Campbell, the psychiatrist who treated appellant during the five days she spent in St. Charles prior to the hearing, testified that appellant was in seclusion "almost 24 hours a day" for the first two days "because of her attempts to push people around, move out of the room, [and] being quite frantic in talking, of course, very rapidly." Campbell testified that they "try to get patients out of seclusion as rapidly as possible because it can be frightening, of course." Yet appellant had to be placed back in seclusion shortly after her first release because "she was trying to intrude into other patients' rooms, becoming nondirectable" and being "threatening." Appellant was also placed in seclusion part of the night before the hearing because she was "becoming aggressive and confrontational." As examples of appellant's "aggressive and confrontational" behavior, Campbell explained that, the first day he saw appellant, she "started rushing around, actually was pushing on [him] trying to get [him] out of the way of the door, would not restrain herself, would not sit down and actually have a conversation with [him] in any way. She wasn't capable of doing that."

Donald Murphy, a crisis and commitment investigator for Deschutes County, met with appellant each morning along with Campbell. He was present for what he described as appellant's "aggressive, volatile behavior" on the first morning, which he explained was appellant "trying to push

her way out of the room." Murphy testified that appellant displayed "aggressiveness" again on the second or third day because, when Murphy and Campbell came to meet her, appellant stood with her face "right up against" the small window in the door, "glaring," and "would not back up from the door" to allow Murphy and Campbell to enter. Murphy testified that appellant "had to be placed in seclusion at least once or twice" every day that she was hospitalized "due to her volatile behavior."

Appellant told Murphy that she does not need medication "because the only healing process is the one through her God." Campbell also predicted that appellant would stop taking her medication if not forced to take it. In his opinion, appellant needs to be committed "for her to be able to get any kind of ongoing treatment." And Campbell testified that it is "crucial" for appellant to take her medication because without it, "[s]he would very quickly relapse into a psychotic state where she was, as this time, standing on corners, growling at people, threatening them, making aggressive gestures and posturing."

Campbell testified that, if appellant were to stop taking medication, he "would worry about her either getting into some sort of difficulty with other civilians or the police where she could get hurt or possibly where she would end up attacking somebody if they appeared threatening or fit into her paranoid delusions in any way." Campbell also expressed concern that appellant seemed unable "to understand that she's most likely going to lose her apartment because she wrecked it prior to coming in the hospital" and "has no seeming concerns about how she's going to take care of herself if she leaves the hospital." Murphy testified that, when asked about her plan if released, appellant said she wanted "a little cabin by the river with flowers and peacefulness," but that "she couldn't say how that would happen." When asked what she would do if she were evicted from her home, appellant responded "that God would see to it at that time."

Ultimately, when Campbell was asked whether he believed appellant presented a danger to herself or others, he testified that, "[r]ight this minute, she does not represent

a danger to herself. She could be dangerous to other people if she becomes agitated, if people don't treat her very cautiously. But I don't think she would intentionally right this minute hurt someone." He added that, "as soon as she goes off her medicine, the risk goes up very high." Murphy also believed that appellant's "behaviors of walking in traffic, walking into people's homes uninvited, [being] combative towards police officers, those types of behaviors do cause her to be a danger to herself and others."

## II. DISCUSSION

The process by which a person may be committed to the Oregon Health Authority for involuntary mental health treatment is specified by statute. If, following a hearing, the circuit court determines that the person meets the definition of "a person with mental illness," the court may commit the person to the Oregon Health Authority for up to 180 days. ORS 426.130(1)(a)(C), (2). As pertinent to this case, "a person with mental illness" includes a "person who, because of a mental disorder, is * * * [d]angerous to self or others." ORS 426.005(1)(f)(A).[2] The state bears the burden of proving the statutory requirements for commitment by "clear and convincing evidence." ORS 426.130(1)(a); *State v. M. R.*, 225 Or App 569, 202 P3d 221 (2009). As we emphasized in *M. R.*, that standard of proof "is a rigorous one, requiring evidence that is of extraordinary persuasiveness, and which makes the fact in issue highly probable." 225 Or App at 574 (internal quotation marks omitted).

On appeal, appellant does not dispute that the state proved she suffers from a mental disorder. She argues, however, that the evidence is legally insufficient to establish that her mental disorder presents the kind of danger to herself or others that we have required for involuntary civil commitment. Whether the evidence of danger is legally sufficient to support a determination that appellant is "dangerous" for purposes of ORS 426.005(1) is a determination

---

[2] Prior to a 2015 amendment that also renumbered parts of ORS 426.005(1), the definition of "person with mental illness" that is currently set out at ORS 426.005(1)(f)(A) was set out at ORS 426.005(1)(e)(A) (2013). Or Laws 2015, ch 461, § 1. Throughout the opinion, we cite the current numbering of the statute, because the pertinent language of that subparagraph has not changed.

that we review as a matter of law. *See State v. B. B.*, 240 Or App 75, 82, 245 P3d 697 (2010) (applying that standard in reviewing a "[d]angerous to self" determination). We agree with appellant that the evidence of danger in this record is legally insufficient.

Although "dangerous" is a common term that, in ordinary usage, may refer to a broad range of threats, the type of "danger" necessary to justify an involuntary civil commitment is a narrow range of serious and highly probable threats of harm. For example, to permit commitment on the basis that a person is dangerous to self, the clear and convincing evidence "must partake of a 'particularized,' and 'highly probable,' threat to [the] appellant's safe survival, including a risk of substantial harm, in the near future." *Id.* at 84 (citations omitted). Similarly, to permit commitment on the basis that a person is dangerous to others, the state must establish "that actual future violence is highly likely." *M. A.*, 276 Or App at 629 (internal quotation marks omitted). We impose those rigorous standards because of "the serious deprivation of liberty and social stigma that are attendant to a civil commitment, and the fact that such a preventive confinement is predicated on a prediction of future behavior." *State v. D. R.*, 239 Or App 576, 582-83, 244 P3d 916 (2010).

A. *Danger to Self*

We begin by considering all permissible inferences that the trial court could have drawn from the evidence regarding appellant's danger to herself, and we explain why those inferences do not rise to the kind of "danger" required to justify an involuntary civil commitment. As we have emphasized, "our cases have uniformly imposed a rigorous threshold with respect to what the state is required to show to establish that an individual is '[d]angerous to self,' ORS 426.005(1)(e)(A), as a matter of law." *B. B.*, 240 Or App at 82. To meet that threshold, the threatened harm to self must involve "serious" and "actual" physical harm in the "near term." *Id.* "Indeed, a number of our cases have suggested that the potential harm must be 'life-threatening' or involve some 'inherently dangerous' activity." *Id.* at 82-83 (quoting *State v. D. J.*, 206 Or App 146, 153, 135 P3d 397 (2006)).

Moreover, the prospect of serious physical harm must be based on more than "apprehensions, speculations, and conjecture." *B. B.*, 240 Or App at 83 (internal quotation marks and citation omitted).

Here, the concern that appellant will be seriously injured in the near future because of her delusional interactions with traffic does not rise beyond the level of apprehension and speculation. Viewing the evidence in the light most favorable to the disposition of commitment, the trial court could rationally infer that appellant would stop taking medication, decompensate and become delusional, and engage in conduct similar to that described in the record. However, the record does not permit an inference that the described conduct threatened serious physical injury to appellant, and any possibility that appellant would engage in riskier conduct in the near future is merely speculative.

We first examine the evidence of appellant's interactions with traffic. Although the state characterizes this behavior as "clearly perilous," there is no evidence that appellant's conduct—if it were to be repeated—involved the kind of "'particularized,' and 'highly probable,' threat to appellant's safe survival" that permits an involuntary civil commitment. *See id.* at 84 (citations omitted). We have emphasized that "delusional or eccentric behavior—even behavior that may be inherently risky—is not necessarily sufficient to warrant commitment." *Id.* at 83 (quoting *State v. T. R. O.*, 208 Or App 686, 691, 145 P3d 350 (2006)).

Rather, we have often required evidence that the delusional behavior either led to past harm or to narrowly averted past harm. For example, in *State v. D. R.*, 183 Or App 520, 524, 52 P3d 1123 (2002), we concluded that the record was insufficient to establish that the appellant would "wander into traffic and injure herself" because, although there was evidence that the appellant frequently "wander[ed] the streets" when not on her medication and had "'stepped off the curb' some unspecified number of times," there was no indication that the activity had "ever led to injury" or that "authorities interrupted a sequence of events that has, in the past, led to disaster." Similarly, in *State v. K. P.*, 178 Or App 89, 94, 35 P3d 1084 (2001), the appellant lacked self-control

and had repeatedly hit her head against a divider separating the front and back seats in a police car, but we concluded that those facts did not establish the requisite danger to self, because "[t]here is no evidence that [the] appellant's poor judgment and lack of self-control have resulted in harm, so we are left to speculate about how her condition might lead her to harm herself in the future." Although both *D. R.* and *K. P.* were decided on *de novo* review, we highlighted both decisions in *B. B.* and, in that case, emphasized that our disposition in each of the *de novo* cases provided guidance because each "ultimately derived from legal principles that apply and control regardless of the standard of appellate review pertaining to the predicate facts." 240 Or App at 84.

We do not suggest that evidence of past harm is the only evidence sufficient to establish the "'particularized,' and 'highly probable,' threat to appellant's safe survival" that civil commitment requires. *See B. B.*, 240 Or App at 84 (citations omitted). But in the few cases in which we have affirmed a civil commitment based on evidence of risky behavior without actual past harm, the records have included such a concrete risk of specific harm that they provide a useful contrast to this case. In *State v. C. C.*, 258 Or App 727, 733, 311 P3d 948 (2013), we upheld the civil commitment because there was evidence that the appellant was an insulin-dependent diabetic, that he suffered delusions that caused him to stop using insulin, and that stopping the insulin would cause "the near future onset of serious medical consequences from untreated diabetes." In *State v. R. E.*, 248 Or App 481, 484, 273 P3d 341 (2012), we upheld the civil commitment based on evidence that the appellant was suicidal because he faced prosecution for forging prescriptions and—crucial to our decision—that he was in possession of a powerful sedative and said he was thinking about using the sedative to harm himself. In both cases, the path from mental disorder to serious harm in the near term was so concrete that a prediction of future harm was "particularized" and "highly probable." *See B. B.*, 240 Or App at 84.

Another example of a clear path to predicting "particularized" and "highly probable" future harm is *State v. D. R.*, 239 Or App 576, 244 P3d 916 (2010), on which the

state and the dissent rely. *See* 281 Or App at 758. In *D. R.*, we concluded that the record permitted a determination that the appellant was dangerous to herself because there was evidence that the appellant crossed a busy four-lane street outside of a crosswalk and with her head down in a way that two drivers "had to stop abruptly to let her cross." 239 Or App at 579. Moreover, on the same day, the appellant drove through a red light, cut off an approaching car, and ran three stop signs—once crossing just ahead of an approaching semi-truck. *Id.* at 580. In other words, although the appellant had not yet been harmed by her risky behavior, she had so narrowly avoided harm that, were she to continue, serious injury in the near term would be almost inevitable. *D. R.*, thus, supplies another useful contrast to the evidence of risk in this case.

Unlike the record in *D. R.*, in which details of past near-misses allowed an inference that the appellant interacted with traffic in a way that presented a "highly probable" risk of "serious" physical harm, the record in this case contains no evidence that appellant placed herself in the path of any vehicle approaching with enough speed to harm her or that any driver had to stop abruptly to avoid hitting appellant. Indeed, with regard to appellant's first traffic encounter, the only evidence regarding the speed of approaching cars is the uncontradicted testimony of the officer that traffic was "backed up in all directions" and that "everyone at every corner of the intersection was stopped and watching." Although it is possible that appellant crossed in front of rapidly approaching cars to reach the turn lane in the middle of the road, and possible that some car had to stop abruptly to avoid hitting her, those possibilities are merely speculative on this record. There is no evidence—let alone clear and convincing evidence—that appellant entered the road under circumstances that made it "highly probable" she would be hit by a car. Predicting that similar behavior would produce that harm in the future is speculative.

Even more speculative is any prediction of serious future harm from appellant's behavior during the second traffic encounter. The only evidence of that encounter is that appellant was sitting near, but not in, traffic. Even if the trial court could permissibly infer that appellant crossed the

roundabout to reach that location,[3] there is no evidence that she did so under traffic conditions that required any vehicle to stop suddenly to avoid hitting her. Indeed, there is no evidence at all about traffic patterns, crosswalk locations, or other circumstances relevant to how appellant reached the location where officers found her. Thus, even if the trial court could find that appellant will repeat the kind of encounters with traffic in which she has engaged twice before, there is no evidence that those situations exposed her to the type of danger that "partake[s] of a 'particularized' and 'highly probable' threat to appellant's safe survival." *B. B.*, 240 Or App at 84 (citations omitted).

We do not suggest that appellant was engaging in safe behavior, or that it was unreasonable for the officers and the trial court to be concerned about her delusional interactions with traffic; even pedestrians entering at marked crosswalks are at risk of serious injury from traffic on the roadway. But "civil commitment is not intended to be used as a 'paternalistic vehicle' to 'save people from themselves.'" *T. R. O.*, 208 Or App at 692 (quoting *K. P.*, 178 Or App at 95). As in *B. B.*, the evidence of risk from appellant's interactions with traffic is insufficient to permit appellant's civil commitment because "nothing in the evidence establishes that appellant's 'unpredictable' and 'impulsive' behavior resulted in any serious harm or substantial proximate risk of such harm, much less that a reoccurrence of such conduct will present a nonspeculative risk in the near future." 240 Or App at 85.[4] Appellant is correct that the trial court erred in

---

[3] The officer testified that when he first encountered appellant, "[s]he was—we were in the northwest corner—if you can call it a corner of a roundabout—near *** those brick walls where they put the name of the housing development on it." At the point when he handcuffed appellant, he described her as "sitting in the grassy area between the roundabout and the street and the wall."

[4] Appellant's other delusional interactions—struggling with arresting officers and an isolated incident of wandering into a neighbor's home—similarly may be grounds for concern, but not for civil commitment. *See M. A.*, 276 Or App at 630 (explaining that "a struggle with arresting officers is legally insufficient to permit the conclusion that a person is a danger to himself or others"); *T. R. O.*, 208 Or App at 691, 693 (holding that "[e]vidence of delusions, general lack of judgment, and failure to plan for release ***, is simply not the kind of evidence of a particularized, near-term threat that is required to justify [the] appellant's involuntary commitment on the ground that he is a danger to himself").

ordering her to be civilly committed on the basis that she is dangerous to self.

B. *Danger to Others*

Appellant is also correct that the trial court erred in ordering appellant to be civilly committed on the basis that she is dangerous to others. To establish that a person is dangerous to others, for purposes of civil commitment, the evidence must be sufficient to establish by clear and convincing evidence "that 'actual future violence is highly likely.'" *M. A.*, 276 Or App at 629 (quoting *State v. L. D.*, 247 Or App 394, 400, 270 P3d 324 (2011)). According to the state, the evidence here meets that standard because "appellant repeatedly threatened others, tried to bite people, and carried out an overt violent act against the security officer by kicking him," and because appellant's "aggressive behavior, even while on medication in a controlled environment, was sufficiently threatening to require that she be placed in seclusion at least once or twice a day." We disagree that that evidence is legally sufficient to support involuntary civil commitment.

As we recently emphasized in *M. A.*, "we have consistently held that evidence of a struggle with arresting officers is legally insufficient to permit the conclusion that a person is a danger to himself or others." 276 Or App at 630 (citing *State v. A. M. R.*, 236 Or App 186, 192, 235 P3d 720 (2010), and *State v. S. D. M.*, 198 Or App 153, 159, 107 P3d 683 (2005)). In *S. D. M.*, we held that evidence that the appellant reacted violently when officers attempted to remove her from her backyard was insufficient to establish that she had "a propensity to react violently *** or that there is a high probability that she will commit a violent act in the future." 198 Or App at 159. And, in *A. M. R.*, we explained that the appellant's resistance to being handcuffed and taken to the patrol car, "including kicking and biting [one of the officers], appear[s] to have been an isolated response to 'an unusual and threatening situation,' and, accordingly, fail[s] to 'clearly form[] the foundation for a prediction of future dangerousness.'" 236 Or App at 192 (quoting *S. D. M.*, 198 Or App at 159). For the same reasons, we conclude that appellant's struggles while resisting arrest and

while resisting the efforts of the security guards to handcuff her arms to the bed and to force her legs apart are insufficient to clearly form "the foundation for a prediction of future dangerousness" outside of that unusual context.

Other than appellant's struggles against forcible interference with her body, there is no evidence that she harmed or attempted to harm anyone. The closest that the record comes to describing other "aggressive behavior" is the behavior in the hospital that Campbell described as "postur[ing]" and "very threatening" toward mental health staff—that appellant "rushes at them, begins to scream at them, talking about killing them because they're evil" and "they have zombie souls." Even if we were inclined to accept appellant's behavior toward mental health workers as predictive of conduct outside that situation,[5] Campbell emphasized that appellant "has not actually hit anyone since coming into the unit—since coming into the emergency room." Rather, he described appellant's behavior as concerning because "[i]t's hard to tell if she's not going to impulsively strike someone." That concern, however, is not the same thing as a clear "foundation for a prediction of future dangerousness."

The other behavior that Campbell and Murphy viewed as "aggressive" or "volatile," and that prompted much of appellant's confinement in seclusion, is even less suggestive of future violence. That conduct included that appellant was "rushing around" and "pushing on" Campbell to get him out of the way of the door, that she was "trying to push her way out of the room," that she stood with her face "right up against" the window and refused to back away from the door to allow Murphy and Campbell to enter, and that she wandered into the rooms of other patients. We have previously emphasized that behavior of that type is not sufficient to establish that "actual future violence is highly likely." *State v. B. P.*, 229 Or App 487, 493, 211 P3d 975 (2009) (evidence that a person is "agitated and aggressive is not sufficient evidence" to establish that the person is dangerous to others); *see also M. R.*, 225 Or App at 576 (evidence that the

---

[5] We note that there would be a certain irony to involuntarily hospitalizing a person because that person engages in threatening behavior when involuntarily hospitalized.

appellant had repeated unwanted contacts with another person and entered others' offices and rooms uninvited "may have been socially uncomfortable or unpleasing" but "[could not] properly be characterized as physically dangerous to others").

We recognize that appellant also made threatening comments, such as her "claims that she's an agent of God here to wipe out zombie souls who are encased in pedophiles and other people who hurt children," her desire to "kill the rapists and pedophiles" she thought she would see in court, and her talk about killing the mental health workers at the hospital "because they're evil; they have zombie souls." We have emphasized, however, that, in assessing whether a record is legally sufficient to support commitment, "[e]vidence of verbal threats of violence is insufficient if the threats are not accompanied by any overt act to follow through with the threat or if they are not made under circumstances that make actual future violence highly likely." *State v. D. R. K.*, 216 Or App 120, 122, 171 P3d 998 (2007).

For example, we explained in *State v. D. L. W.*, 244 Or App 401, 405, 260 P3d 691 (2011), that, "if a mentally ill person has threatened others and has also carried out an overt violent act in the past against another person, those facts generally constitute clear and convincing evidence that the person is a danger to others." In *D. L. W.*, in which we determined that the evidence was legally sufficient to support commitment, the evidence included clear threats against specific people combined with overt physical violence. Specifically, the appellant told one neighbor that "she had better watch her back because, 'somebody will slice your throat'"; "called a different neighbor at work approximately 30 times in one day, telling her to watch her back and threatening to kill her"; "told another neighbor, 'I'm going to kill you, you bitch' and then pretended her hand was a gun and mimed shooting"; and, during an argument with her housemate, "pretended she had a knife in her hand and acted out stabbing [him] in the stomach." *Id.* at 403-04. We emphasized that, in addition to those "serious verbal threats," the state presented evidence that the appellant had recently "shoved [her housemate] with both hands into the kitchen

counter, punched him hard enough on his shoulder to bruise him, and threw a metal object at him." *Id.* at 405.

Other cases in which we have based a determination of dangerousness on threats have, as in *D. R. K.,* involved explicit threats combined with overt acts that made it highly likely that actual violence would follow. *See State v. G. L.,* 208 Or App 212, 217, 144 P3d 967 (2006) (evidence sufficient to establish danger to others where the appellant threatened to kill his wife and exhibited "extremely focused homicidal ideation"); *State v. Bodell,* 120 Or App 548, 550, 853 P2d 841 (1993) (evidence was sufficient to establish danger to others where the appellant "said that he wanted to 'sacrifice' his one and one-half year-old child and told his pregnant wife that she and her unborn child would die, because they were 'evil'"); *State v. Furnish,* 86 Or App 194, 197, 738 P2d 607 (1987) (evidence sufficient to establish danger to others where the appellant threatened and harmed members of his family more than once).

By contrast, in this case, appellant's threats against others were generic and imaginary, without any evidence of an overt act. There is no evidence appellant's delusional threats coincided with any physical violence toward a perceived "zombie soul," that she took any preliminary step toward killing a perceived "zombie soul," or even that she had a plan for how she would carry out the killing of a perceived "zombie soul." Even when appellant's threats were arguably addressed to particular "zombie souls"—the mental health workers—the evidence is that she did no more than rush at them and scream at them but without actually hitting them. Those are not the kind of overt acts that make threatened violence highly likely.

Finally, we acknowledge that Campbell and Murphy opined that appellant could present a danger to others. But, as our discussion of the case law makes clear, only certain types of threatening behavior are legally sufficient to support a determination that a person is "dangerous" for purposes of an involuntary civil commitment. Thus, the significance of an expert opinion that a person is "dangerous" may depend upon the extent to which the expert relies on the kinds of threats of harm that are legally sufficient to permit a civil

commitment. For example, in *State v. R. A.*, we held that expert opinions that the appellant was "extremely dangerous to other people" did not constitute clear and convincing evidence that the appellant was "dangerous" for purposes of civil commitment, because the opinions were "unconfirmed by any other evidence" that the appellant had previously used force under circumstances that established a "'foundation for a prediction of future dangerousness.'" *State v. R. A.*, 209 Or App 647, 653, 149 P3d 289 (2006) (quoting *State v. D. L.*, 202 Or App 329, 335, 122 P3d 97 (2005), *rev den*, 340 Or 308, 132 P3d 28 (2006) (internal quotation marks and citation omitted)).

The opinions of Campbell and Murphy, similarly, are based solely on the kind of evidence that, as we have just explained, does not establish a nonspeculative "foundation for a prediction of future dangerousness." Campbell explained that he based his opinion on a "worry" that appellant would "possibly * * * end up attacking somebody if they appeared threatening or fit into her paranoid delusions" and that appellant "could be dangerous to other people if she becomes agitated, if people don't treat her very cautiously." But Campbell's "worry" that appellant "could be dangerous" and "possibly" attack someone who might fit into her delusions is merely speculation. Similarly, Murphy testified that he relied on appellant's "behaviors of walking in traffic, walking into people's homes uninvited," and being "combative towards police officers." As we have explained above, however, none of those behaviors on which Murphy based his opinion supplies a legally sufficient foundation for a prediction of the kind of future danger that permits an involuntary commitment. As in *R. A.*, neither opinion is confirmed by the kind of evidence of behavior that establishes "a foundation for a prediction of future dangerousness." *Id.* at 653.

Reversed.

**LAGESEN, J.,** dissenting.

I agree with the majority opinion's conclusion that the evidence was insufficient to support appellant's commitment on the ground that she was a danger to others at the

time of commitment. I disagree, however, with its conclusion that the evidence is insufficient to support appellant's commitment on the ground that she was a danger to self.

The scope of the disagreement is narrow. We agree that the evidence would support a finding that, at the time of the hearing, appellant, as a result of her mental disorder, would again "engage in conduct similar" to that in which she had engaged four months earlier. 281 Or App 750. That is, we agree that the evidence would permit a factfinder to infer that, absent commitment, appellant would be back in traffic in the same way she had been four months earlier. We disagree, however, as to whether the evidence in the record would permit a finding that appellant's previous interaction with traffic was of the type that put her at risk of serious physical harm, so as to permit appellant's commitment as a danger to self upon a finding that she likely would repeat that conduct. *See, e.g., State v. D. R.*, 239 Or App 576, 586, 244 P3d 916 (2010) (upholding commitment of person who previously had interacted with traffic in a way that posed a risk of serious physical harm where record also supported finding that, as a result of a mental disorder, person would repeat that conduct absent commitment). The majority opinion concludes that it would be speculative on this record to find that appellant was at risk of serious physical harm during her prior encounter with traffic; I would conclude otherwise.

The evidence in the record about appellant's previous traffic incident consists of (1) the testimony of the police officer who responded to the calls about appellant's behavior; and (2) statements by officers, treatment providers, and appellant in appellant's medical records describing the incident. Appellant's medical records were admitted into evidence without objection, and without limitation as to how the trial court could consider them in making its decision. That evidence shows the following facts: appellant, who was suffering delusions of being Mary Magdalene, was found in the middle of Reed Market Road at its intersection with 15th Street in Bend. Reed Market Road is a busy road, it was a busy time of day, and appellant was "dangerously close to the cars" and "not moving when cars were coming close to her."

Police, responding to multiple reports that appellant "was a hazard [and] a danger to herself [and] others," arrived to discover appellant in the street with traffic backed up in all directions, and persuaded appellant to come to the side of the road. However, appellant soon "r[a]n away" from officers, entered the middle of the road, and began walking down the middle of one of the lanes of travel. Police forcibly removed appellant from traffic, and took her to the hospital. There, in reporting the incident to the persons who would be treating appellant, officers explained that appellant had been "dodging the traffic," and appeared to be either suicidal or so delusional that she did not apprehend the danger presented by traffic. Appellant later told treatment personnel that there had been no cars where she was standing in the road.

Those facts, in my view, permit the inference that appellant was at risk of serious physical harm during the prior incident. It is true, as the majority opinion notes, that there is no direct evidence that any cars had to swerve to avoid hitting appellant. 281 Or App 752. However, I do not think such evidence is necessary to permit an inference that appellant faced a real risk of getting hit by a car and suffering serious physical injury as a result. Again, appellant was "dodging the traffic" in a busy street at a busy time of day, coming "dangerously close" to cars all while unaware that cars were present. Witnesses describing her conduct characterized it as either suicidal or so delusional that she did not understand the risk posed by the cars. Although the additional evidence in the record indicates that appellant was not, in fact, suicidal, but, instead, was unable to comprehend the risks of traffic due to her delusions, regardless of what motivated appellant's conduct, the descriptions of it permit the reasonable inference that it was life-threatening in nature.

In addition, to the extent that this is a close case on the record, I am inclined to afford some deference to the trial court's assessment of the risk posed to appellant by traffic at the intersection in question. The hearing transcript indicates that all participants in the proceeding, as members of the Bend community, were familiar with the locations in which appellant interacted with traffic, and undoubtedly were aware of the conditions at the intersection of Reed Market Road and 15th Street, including, for example, that the speed

limit on Reed Market Road at 15th Street transitions from 35 mph to 40 mph, and that the speed limit on 15th Street at that location is 40 mph.[1] *See* OEC 201(b) (providing for judicial notice of facts "[g]enerally known within the territorial jurisdiction of the trial court," or "[c]apable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"). In other words, a local factfinder could infer, based on knowledge about local roads, that the intersection where appellant's incident occurred was a place where traffic was likely to be coming fast until it was brought to a halt by appellant's presence, given the other affirmative evidence presented about the particular circumstances of the incident.

I note that, in concluding to the contrary, the majority opinion relies on cases decided during the time period in which we reviewed *de novo* in civil commitment cases. In particular, the majority opinion echoes the emphasis those cases place on how persuasive the evidence must be to satisfy the state's burden of proof in a civil commitment case. 281 Or App at 750. Although I acknowledge that we concluded in *State v. B. B.*, 240 Or App 75, 84, 245 P3d 697 (2010), that our *de novo* decisions remain precedential—and, thus, the majority opinion's reliance on those cases is consistent with *B. B.*—I question that continued reliance for two reasons.

First, our continued reliance on *de novo* case law risks obscuring what our role is when we do not review *de novo*. As I have pointed out before, *Wels v. Hippe*, 269 Or App 785, 809-10, 347 P3d 788 (2015) *(en banc)* (Lagesen, J., concurring), *rev allowed*, 358 Or 611 (2016), absent a decision to review *de novo*, our task on appellate review does not entail evaluating how persuasive the evidence is. *Id.* That task belongs to the factfinder; our job on review is to evaluate whether the evidence would permit the factfinder to reach the result that it did. *See id.* In view of that change in our role, our prior statements about how persuasive the evidence need be are beside the point for purposes of non-*de novo* review, and do not properly bear on our decisions in

---

[1] Or. Dep't of Transp., Speed Zone Order No. J7864 (Oct 12, 2006) (setting speed limit for 15th Street); Or. Dep't of Transp., Speed Zone Order No. J7567 (May 31, 2005) (setting speed limit for Reed Market Road).

cases where we elect not to review *de novo*. Yet we continue to reiterate those statements regarding how persuasive the evidence must be, as if those statements are relevant to our role on non-*de novo* review, suggesting that we are, in fact, conducting some sort of review of the persuasiveness of the evidence.[2] There is nothing legally wrong with that; ORS 19.415(3)(b)[3] confers upon us the continued authority to act as factfinder in these cases, and there may be good reasons to do so, given the interests at stake in civil commitment cases. My point, simply, is this: our *de novo* review case law, and its emphasis on how persuasive the evidence must be in civil commitment cases, is not particularly germane to our role in non-*de novo* review cases, and our continued reliance on that case law as authoritative in non-*de novo* review cases may be giving rise to confusion as to what that role is.

Second—and this is a variation on my first point—because of the fundamental differences between our role when we review *de novo* and act as factfinder, and our role when we do not act as factfinder on review, it is questionable how much precedential weight we should give to decisions in which we were acting as the trier of fact. To be sure, some of our prior opinions in civil commitment cases answered questions of statutory construction and constitutional law, and must be afforded precedential weight on those questions. However, many of our decisions simply represent our take on the evidence in the case at hand.

In addressing the same issue with respect to its own opinions, the Supreme Court has cautioned against affording precedential weight to decisions which reflect that court's exercise of its fact-finding function on *de novo* review,

---

[2] *See, e.g., State v. E. D.*, 264 Or App 71, 73, 331 P3d 1032 (2014) (explaining that evidence supporting commitment decision must be "of extraordinary persuasiveness"); *State v. K. K. G.*, 267 Or App 319, 320-21, 340 P3d 735 (2014) (emphasizing the need for extraordinarily persuasive evidence); *State v. A. D. S.*, 258 Or App 44, 47, 308 P3d 365 (2013) (discussing how the state bears the heavy burden in civil commitment cases, that the evidence must be "extraordinary persuasiveness," and how "[w]e consider the evidence in the record under that standard" in order to determine whether it is sufficient to support the decision on review); *State v. D. M.*, 245 Or App 466, 470, 263 P3d 1086 (2011) (same).

[3] ORS 19.415(3)(b) provides that in an appeal in an equitable case, "the Court of Appeals, acting in its sole discretion, may try the cause anew upon the record or make one or more factual findings anew upon the record."

explaining that "the findings that other justices have made while sitting as triers of fact on records unique to the cases before them do not establish rules of law to be applied to" the court's subsequent determinations in similar cases. *Willbanks v. Goodwin*, 300 Or 181, 199, 709 P2d 213 (1985); *see also Reynolds Metals Co. v. Dept. of Rev.*, 299 Or 592, 597, 705 P2d 712 (1985) ("Indeed, in the process of publicly sifting the evidence, we have sometimes expressed a 'holdings' what are really only 'findings,' and this has led to confusion as to what rules of law are laid down in our cases."). We previously indicated that we would take a similar approach with respect to our own *de novo* review civil commitment cases, noting that it often would not be appropriate to assign precedential weight to our dispositions in such cases. *State v. Watkins*, 35 Or App 87, 90, 581 P2d 90 (1978) ("We do not intend to write detailed opinions in future civil commitment cases where the issues are essentially factual and a statement of the evidence would have little or no precedential value for courts or counsel."). I would resume that approach, and discontinue our reliance on our civil commitment decisions in cases decided on *de novo* review, except where it is clear that a decision represents the resolution of a question of statutory construction or other question of law. I would do so to avoid the risk of erroneously treating a factual determination that we were not persuaded by the evidence in a particular case that we decided on *de novo* review as a binding legal determination that the evidence described would be legally insufficient to support a different finding.

In sum, I would conclude that the evidence presented below was sufficient to permit the trial court to find that appellant posed a danger to herself and, in particular, to find that appellant was at risk of serious physical injury by being hit by a car as of the time of the commitment hearing. Although that finding would not be compelled by the record—a trial court could weigh the evidence differently and find otherwise that it was not persuaded that appellant was at risk of serious physical injury from traffic—the finding is a permissible one.

I therefore respectfully dissent from the contrary conclusion reached by the majority opinion.