DEHOOG, J.
*307 *680 Appellant seeks reversal of a judgment committing him to the custody of the Mental Health Division for a period not to exceed 180 days. See ORS 426.130. In his only assignment of error, appellant contends that the trial court erred in determining that he presented a danger to himself and others. See ORS 426.005(1)(f)(A). We agree and, for the reasons set forth below, we reverse.
On review of the trial court's judgment, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." State v. S. R. J. , 281 Or. App. 741, 743, 386 P.3d 99 (2016) (internal quotation marks omitted).[1]
Appellant was 49 years old at the time of the civil commitment hearing in September 2015. His history involving mental illness began in the 1990s, when he was in his 20s; he was diagnosed with schizophrenia and was at some point thereafter civilly committed. In 2000 or 2001, appellant experienced auditory hallucinations and believed that people were trying to harm him; he also had an encounter with the police while he was in front of his grandfather's house. In that encounter, he pulled out a pellet gun in the presence of the police, and officers subdued him by firing at him with beanbag rounds. At some point after that incident, appellant received treatment at the Oregon State Hospital.
For a period of time, appellant received treatment in the community and did well-his medication worked for him and he experienced stability. He worked with a health care organization as a peer counselor for at least four years. He also served on the board of a disability rights organization, and he advocated for culturally competent services in Oregon's mental health system. However, his stability changed in the few years leading up to the commitment *681 hearing that is the subject of this case. His behavior shifted around the time that he was assigned a new counselor through the Department of Veterans' Affairs (VA) and he was prescribed a different medication that was not effective. He appeared to have relapsed-he experienced auditory hallucinations and struggled with behavioral issues, and his memory changed, causing him to believe that he was still in the 1990s. At some point after the period of stability, appellant was involved in an incident at the credit union office where he banked, resulting in him being barred from that office location.
In the fall of 2014, appellant left the Portland area; he spent some time in Seattle and then travelled to Canada with the intent of seeking "political asylum." He feared living in the United States as a gay black man with mental illness. In April 2015, after his request for asylum in Canada was denied, the Canadian authorities took him to the border, where he crossed into the State of Washington. He then spent time in Mexico and San Diego, California.
While appellant was in the San Diego area, he placed a call to Governor Brown's constituent office and left the following voicemail:
"This message is for Governor Kate Brown. This is [appellant], the son of [a] former [state legislator]. Today is Monday, June 15th. Governor Brown, call off your wolves! Capiche? That means call off all of your fucking agents, actors, and whatever the fuck else your goddam problem is, bitch! You'll die! I consider you, bitch, a fucking enemy. *** I'll kill you! Do you *308 fucking understand? I'll fucking kill you, bitch! You're an enemy. *** Don't fuck with me, I'll kill you dead, bitch! You're a dead fucking bitch! Three times! This time I'll walk up, and this fucking day you are dead bitch! Fucking dead! *** You're dead! ***."
Oregon State Police Officer Schinnerer, who was on assignment with the Governor's protection unit, was very concerned by the voicemail. According to Schinnerer, although hostile phone calls to the Governor's office are not uncommon, appellant's voicemail was of a different intensity than other calls. As a result, he began to investigate and attempted to locate appellant. Schinnerer contacted appellant's mother and learned that appellant was in the San *682 Diego area. In response to that information, Schinnerer contacted the San Diego police department, who put Schinnerer on an alert list so that he would be notified if appellant had contact with that department. Schinnerer also began contacting appellant's mother regularly in an effort to locate appellant. Ultimately, however, Schinnerer never contacted appellant.
On September 4, 2015, 10 days before the hearing, appellant travelled by train to Portland, intending to get a copy of his birth certificate so that he could apply for an enhanced identification card, which he believed would allow him to lawfully enter and remain in Canada or Mexico. While on the train, appellant perceived two women on the train to be directing hostilities at him and one of them to have threatened to kill him. He responded by calling one of the women a "bitch." She, in turn, sought assistance from the train conductor, who asked appellant to move to the lower compartment of the train; he did. Appellant also claimed to have called the Federal Bureau of Investigation (FBI) from the train because he believed that people on the train were being hostile to him and he wanted train-side assistance in Portland.
At some point before the train arrived in Portland, the conductor called the police. Sergeant Burley, from the Portland Police Bureau's Behavioral Health Unit, went to Union Station along with his colleague, Clinician Hackett.[2] When Burley arrived, he observed that appellant, who had gotten off of the train and was waiting for a taxi, was dressed in what appeared to be a white security guard's uniform and was wearing a gold badge on his chest. Appellant also wore a duty belt on which he carried a six- to eight-inch Maglite flashlight, handcuffs, and a pepper spray holder, but no pepper spray.[3] Burley spoke with appellant, who told Burley that he was in a hurry and in town to get his birth certificate so that he could apply for an enhanced identification card in the State of Washington. Appellant also told Burley that he had been harassed by people on the train *683 throughout his trip from California and that he had taken a video of the individuals with his cell phone, though not while they were harassing him. Appellant permitted Burley to view the video; Burley testified that it appeared to him as though the passengers in the video were unaware that they were being video recorded and that they had no interest in appellant whatsoever-they were simply sitting and reading books or newspapers.
Appellant told Burley that he was a volunteer security person for Amtrak-that he had been asked to provide security while riding the train. He also stated that he was a volunteer bounty hunter and helped out bounty hunter agencies. In that capacity, according to appellant, he followed people, gathered intelligence on them, and provided bounty hunters with information about people he perceived to have broken the law. Appellant also told Burley that, if he saw something suspicious, he would let law enforcement know something was going on. Burley asked appellant whether he would take a person into custody and take law enforcement action if he believed that the person was a criminal. Appellant did not answer that question. Hackett told Burley that she wanted to place a hold on appellant, and the group of responders created a plan to have appellant transported to the hospital;
*309 he was later admitted to the VA hospital and housed in the inpatient psychiatric unit pending his hearing.
The trial court held a commitment hearing on September 14, 2015, and appellant testified. He stated that he did not believe that he needed medication and that, when he used ear plugs, he did not hear voices. He also stated that he felt uncomfortable staying in Oregon and wanted to live somewhere other than the United States because of how he had been treated. He denied having done anything to protect himself when harassed other than to call law enforcement to have them address the situation. He explained that, although he had purchased mace, he had not used it on anyone, and, although he had a flashlight, he had not beaten anyone with it. He denied buying or owning any firearms. He further testified that he did not want to hurt himself or hurt or kill anyone else, including the Governor or other state officials.
*684 Dr. Wilson, a psychiatry resident at the VA hospital who worked with appellant, testified that the working diagnosis for appellant was schizoaffective disorder : manic type. Wilson did not think that appellant believed that he had a mental disorder, and noted that appellant had refused his nightly scheduled dose of medication. Wilson testified that he had tried to discuss the events leading up to appellant's hospitalization with him, but appellant perseverated on alleged staff mistreatment, including various misdeeds that he believed the staff had committed against him, such as verbal assaults, withholding meals, and making threats-beliefs that Wilson explained were the result of paranoid delusions and were not credible. When asked whether appellant had been aggressive toward the hospital staff, Wilson said that he had appeared agitated on multiple occasions when interacting with staff, displaying increased volume and pressured speech. Hospital staff had not, however, had to place appellant in seclusion, restrain him, or use emergency medication. Wilson testified that he believed that appellant would present a danger to himself and others if he were to be discharged from the hospital that day. The danger to himself would result from appellant's belief that he is a bounty hunter, a potentially violent profession, that, coupled with his grandiose and paranoid delusions, would put him in harm's way due to the reasonable probability of encountering violence. The danger to others, according to Wilson, existed for the same reasons.
Appellant's mother testified at the hearing that appellant's belief that people were out to get him was nothing new and happened to him whenever he was "sick." According to appellant's mother, he really believed that people were saying that they wanted him to be dead. She also testified that the symptoms he was exhibiting in 2015 were the same kinds of symptoms she saw him experience in 2000 or 2001, except that the current symptoms were more intense, which she agreed made him more unpredictable.
The trial court did not make explicit findings of fact, but it determined that appellant suffered from a mental disorder and that the state had proved "by clear and convincing evidence that [appellant] is a danger to others, *685 and a danger to himself, and is unlikely and unwilling to participate in voluntary treatments." See ORS 426.130 ; ORS 426.005(1)(f)(A). On appeal, appellant does not dispute that he has a mental disorder. Rather, he contends that the record lacks clear and convincing evidence that he was a danger to himself or others at the time of the hearing. In response, the state asserts that sufficient evidence supports the trial court's determination that appellant posed a danger to others.
"The clear and convincing evidence standard is a rigorous one, requiring evidence that is of extraordinary persuasiveness, and which makes the fact in issue highly probable." State v. M. R. , 225 Or. App. 569, 574, 202 P.3d 221 (2009) (internal quotation marks omitted). To prove that a person is a danger to himself, the state must show that his "mental disorder will cause him to behave in a way that is likely to result in actual serious physical harm to himself in the near future." State v. L. D. , 247 Or. App. 394, 399, 270 P.3d 324 (2011) (emphasis in original). We have previously concluded that "a person can be deemed dangerous to self if he *** has established a pattern in the past *310 of taking certain actions that lead to self-destructive conduct, and then he *** begins to follow the pattern again." State v. Roberts , 183 Or. App. 520, 524, 52 P.3d 1123 (2002). However, "the required expectation of actual serious physical harm must be established by more than mere speculation or conjecture." L. D. , 247 Or. App. at 399, 270 P.3d 324.
In addition, we have explained that "delusional or eccentric behavior-even behavior that may be inherently risky-is not necessarily sufficient to warrant commitment." State v. Olsen , 208 Or. App. 686, 691, 145 P.3d 350 (2006) ; see also Roberts , 183 Or. App. at 525, 52 P.3d 1123 (although the appellant frequently wandered the streets in a confused state of mind, there was no evidence that that activity had led to physical injury). Further, the "abstract possibility that a person's bizarre and agitated behavior might theoretically draw a violent response from someone cannot satisfy the requirement that the threat of harm be real, rather than speculative, and exist in the near future." State v. J. G. , 218 Or. App. 398, 401, 180 P.3d 63, rev. den. , 345 Or. 94, 189 P.3d 750 (2008) (internal *686 quotation marks omitted); see also State v. Webb , 186 Or. App. 404, 409-10, 63 P.3d 1258 (2003) (a generalized concern that a person behaves in a way that could make them vulnerable to an assault is not sufficient to establish a danger to self).
We note that the state does not separately defend the court's determination that appellant is a danger to himself; however, at appellant's hearing, the state's theory was that he put himself in "harm's way"-that he had been a victim in the community, he was confrontational, and he showed a pattern of "amping up," which all contributed to appellant being a danger to himself. Appellant asserts that the evidence presented at the hearing does not meet the rigorous proof threshold to establish that he is a danger to himself.
Here, the evidence in the record indicated that appellant considered himself to be a volunteer bounty hunter and that he suffered from paranoid delusions that people were threatening him and wanted to kill him. In addition, there was evidence of appellant's encounter with the police almost 15 years earlier. At that time, appellant had been experiencing delusions, auditory hallucinations, and other symptoms similar to those he was experiencing at the time of his hearing, and, because appellant wielded a pellet gun in the presence of officers, they shot him with beanbag rounds. That evidence, however, does not provide a nonspeculative basis on which to find that appellant is presently a danger to himself. That is, even though the police in that instance were compelled to use physical force against appellant as a precaution, we do not view those circumstances as creating more than an "abstract possibility that [appellant's] bizarre and agitated behavior might theoretically draw a violent response from someone" else. J. G. , 218 Or. App. at 401, 180 P.3d 63. Thus, those circumstances "cannot satisfy the requirement that the threat of harm be real, rather than speculative, and exist in the near future." Id . (internal quotation marks omitted). And, as we have previously cautioned, "civil commitment is not intended to be used as a paternalistic vehicle to save people from themselves." Olsen , 208 Or. App. at 692, 145 P.3d 350 (internal quotation marks omitted). Accordingly, the evidence here is *687 insufficient to support the trial court's determination that appellant is a danger to himself.[4]
We turn, then, to the second basis for appellant's commitment. To prove that a person is a danger to others, the state "generally must offer more than evidence of appellant's threats of future violence, such as a corresponding overt act demonstrating an intention to carry out the threats or other circumstances indicating that actual future violence is highly likely." L. D. , 247 Or. App. at 400, 270 P.3d 324. "Mere verbal threats of violence are generally insufficient to establish danger to others."
*311 State v. E. D. , 264 Or. App. 71, 74, 331 P.3d 1032 (2014)"However, if a mentally ill person has threatened others and has also carried out an overt violent act in the past against another person, those facts generally constitute clear and convincing evidence that the person is a danger to others." State v. D. L. W. , 244 Or. App. 401, 405, 260 P.3d 691 (2011) ; cf. E. D. , 264 Or. App. at 75, 331 P.3d 1032 (the appellant did not present a danger to himself or others when he committed only "one overt violent act-initiating [a] fistfight-and [made] a few vague threats of violence"). "Whether a person is a danger to others is determined by his condition at the time of the hearing as understood in the context of his history." E. D. , 264 Or. App. at 74, 331 P.3d 1032 (internal quotation marks and brackets omitted).
On appeal, the state argues that appellant's recent verbal acts and his behavioral history provide a foundation for predicting his future dangerousness. The state points to appellant's threatening voicemail to Governor Brown, which understandably was taken seriously by investigators. That threat, the state argues, along with appellant's fixation on his perceived persecution by others, his use of profanities toward strangers, his delusional belief that he is a bounty hunter, his decision to arm himself with pepper spray, handcuffs, and a large metal flashlight, and his prior altercation with the police, collectively support a finding that appellant posed a danger to others. In addition, appellant's treating physician, Wilson, expressed an opinion at the hearing that appellant *688 posed a danger to others. And lastly, according to the state, appellant's apparent condition at the hearing-"clearly delusional" and of the belief that he did not need medication-supported such a finding.
Relying on our case law, appellant emphasizes that his isolated act of leaving a threatening voicemail was not followed by an overt act, and he argues that his threat was not made under circumstances that make actual future violence highly likely. He observes that the threat was made three months before the hearing, that he was in California when he left the voicemail, and that there is no evidence that he repeated the threat or took any overt action in conjunction with the threat. See State v. D. R. K., 216 Or. App. 120, 122, 171 P.3d 998 (2007) ("Evidence of verbal threats of violence is insufficient if the threats are not accompanied by any overt act to follow through with the threat or if they are not made under circumstances that make actual future violence highly likely.").
As with the evidence regarding appellant's dangerousness to himself, we conclude that the evidence in the record is legally insufficient to support the trial court's determination that appellant is a danger to others. Here, the voicemail that appellant left for the Governor contained a highly disturbing and specific threat to kill her. Despite appellant's obviously agitated state at the time he left the voicemail, however, there is no evidence in the record suggesting that he took any steps to advance that threat or even indicating a vague intention to follow through with the threat in any way. Nor is there anything else in the record showing that appellant has, at some time in the past, made other threats of violence, much less that he has followed through on any such threats. See D. L. W ., 244 Or. App. at 405, 260 P.3d 691 (distinguishing circumstances in which an allegedly mentally ill individual has both made threats and engaged in overt acts of violence in the past). That is, there is nothing in the record showing that actual future violence is highly likely in connection with that threat. See State v. Woolridge , 101 Or. App. 390, 395, 790 P.2d 1192, adh'd to as modified on recons. , 102 Or. App. 559, 794 P.2d 1258 (1990) (evidence not *689 sufficient to support finding of danger to others when the appellant made threats to blow up mayor's house and office without any evidence he committed an overt act to follow up on the threats).
Notwithstanding the absence of overt acts of violence in appellant's history, the state urges us to conclude that appellant's current delusional behavior, viewed in light of his history, is sufficient support for the trial court's determination that appellant is a danger to others; we disagree, however, that those circumstances can support the determination that actual future violence is highly likely. We note that, even though appellant believes himself to be a volunteer bounty *312 hunter, there is no evidence in the record indicating that he ever acted in furtherance of that belief in a manner that involved or that might have resulted in violence on appellant's part. For example, there is no evidence that he has ever attempted to make an arrest, take anyone into custody, or otherwise act out on his belief that he is a bounty hunter in a violent manner. It is true that he wore a security guard uniform on the train, carried handcuffs and a Maglite capable of being used as a weapon, and possessed pepper spray; there was no evidence, however, that he had ever used those items against anyone. Further, the record indicates that appellant's plan was to report information of wrongdoing to bounty hunters or law enforcement. And, even when appellant experienced delusions that a woman on the Portland-bound train wanted to harm him, he did not act out physically. Instead, he called her a profane name and recorded a video with his phone. Notably, appellant ultimately cooperated with the conductor's request by moving to a different location on the train, after which, according to his own testimony, appellant called the FBI to seek assistance with the people who wanted to harm him. Nothing about those circumstances reflect an individual who is likely to act out violently as a result of his mental disorder.
Finally, the state relies on appellant's prior encounter with the police as evidence supporting the trial court's determination that appellant is a danger to others. We recognize that appellant's mother testified that his current symptoms were similar to, but more intense than, those that he exhibited at the time of the police encounter. However, *690 that incident had taken place 14 or 15 years earlier, and, at the civil commitment hearing, the evidence of that occurrence was extremely limited and ultimately unhelpful. That is, there was no evidence as to what may have precipitated appellant's behavior or what role, if any, appellant's mental health played in that behavior. As such, the evidence regarding that incident did little to inform appellant's current situation and has little value as a predictor of actual future violence. Given the state's obligation to establish that, as of the time of the hearing, such behavior is highly likely to occur in the near future, the state was required to produce substantially more probative evidence than that. For all of those reasons, the evidence does not support the trial court's determination that appellant presented a danger to others.
In sum, appellant does not dispute that he suffers from a mental disorder. Moreover, the undisputed evidence established that he had exhibited and acted on delusional beliefs, and that he had left an extremely concerning voicemail for the Governor. In concluding that the state has not sustained its burden of proving, by clear and convincing evidence, that appellant is mentally ill within the meaning of ORS 426.005, we do not mean to suggest that the state must wait until an individual acts on such threats before that person may be civilly committed. Rather, under the facts of this case, we merely conclude that the state has not produced extraordinarily persuasive evidence to demonstrate that it is highly probable that appellant will engage in harmful conduct toward others as a result of his mental disorder. As a result, we conclude that the evidence is legally insufficient to establish that appellant is a danger to others-or to himself-and that the trial court therefore erred in committing him.
Reversed.

Neither party requests de novo review, and there are no exceptional circumstances in this case that would warrant such review. See ORAP 5.40(8)(c) (providing that the court will exercise its discretion to review de novo "only in exceptional cases").

Appellant's mother, a family friend, and additional police officers also came to the train station.

An officer later discovered pepper spray in appellant's luggage.

The dissent takes issue with our description of the use of beanbag rounds to subdue appellant as a "precaution." We do not mean to suggest that such measures are not serious or that they do not carry a significant risk of harm. We merely observe that, notwithstanding that fact, that incident says little if anything about whether appellant presented a risk to himself or others at the time of the hearing.