DEHOOG, P. J.
*377 Appellant seeks reversal of an order committing her to the custody of the Oregon Health Authority for a period not to exceed 180 days. See ORS 426.130. In her only assignment of error, appellant contends that the trial court erred in determining that she was a danger to others. See ORS 426.005(1)(f)(A). We conclude that the evidence in the record is legally sufficient to support that determination; accordingly, we affirm.
Appellant asks us to take de novo review of a particular factual finding of the trial court. However, we decline to exercise our discretion to do so. See ORS 19.415(3)(b) ("Upon an appeal in an equitable action or proceeding * * * the Court of Appeals, acting in its sole discretion , may try the cause anew upon the record or make one or more factual findings anew upon the record." (Emphasis added.) ). Therefore, on review of the trial court's ruling, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." State v. S. R. J. , 281 Or. App. 741, 743, 386 P.3d 99 (2016) (internal quotation marks omitted).
In May 2016, appellant stabbed her husband in the hand with a knife; the police subsequently transported her to the hospital. Upon arrival at the emergency department, appellant was speaking in rhymes and was unable to provide her name or date of birth. She reported that she had stabbed her husband because of a "covenant." She also reported that she was experiencing auditory hallucinations and had thoughts about hurting others. Appellant was covered in bruises on her arms and legs, reportedly the result of her husband "holding her down for several *923 hours." According to appellant, "he said he just wanted to help [her]."
While appellant was in the hospital pending the commitment hearing, the attending psychiatrist, Dr. Miller, made a diagnosis of "Bipolar I Disorder, manic episode (first), severe with psychosis." Miller noted that appellant's thought content included "grandiose delusions," and that she *378 had poor insight, was impulsive, had impaired judgment, "[m]inimized and discounted [the] injury to [her] spouse," and reported hallucinations, though it was unclear if hallucinations were then currently present. Appellant refused to take the medication that was prescribed for her.
At the time of the stabbing, appellant was 24 years old and had been married to her husband for seven years. They had two children, one who was three years old and one who was six months old. Appellant reported that she had been hearing voices since her late teens and that, after the birth of her second child, she had begun to experience increased symptoms of depression and auditory hallucinations.
A certified mental health investigator, Hudkins, conducted an investigation and interviewed appellant twice before the commitment hearing, which took place on June 6, 2016. Hudkins prepared a report, which the court admitted without objection at the hearing. Upon first meeting Hudkins in a safety room at the hospital, appellant acknowledged that she had stabbed her husband in the hand and described the events of that night. She said that she "was dancing [and] spinning around," had broken some dishes, and "went psychotic for a moment." She stated that she was trying to "play a part, to lead him" to get her husband to see her point of view. Appellant also told Hudkins that she and her husband had been involved in a "cult" for many years, and stated that she was "brainwashed for eight years." She further stated that she "felt threatened by a predator in [her] house" and that the predator was her husband. A short time later, appellant told Hudkins that she felt safe with her husband, trusted him with her life, and that he was the love of her life. She acknowledged to Hudkins that she hears voices at times, but declined to say what the voices said to her at any given time.
The second time Hudkins met with appellant-which took place on the basketball court at the psychiatric facility where she was being treated-Hudkins observed appellant as she held the broken end of a brush and sang into it as if it were a microphone, then tossed it to the ground and began to dance around. Appellant refused *379 Hudkins's request to speak with her and instead continued to dance. After Hudkins attempted a second time to engage appellant in conversation, appellant told Hudkins that she did not trust social workers and would not talk to her; she would only talk to her attorney, who was supposed to come in later that day. Appellant continued to dance, taking large animated steps in circles around the basketball court. In her report, Hudkins described appellant from that encounter: "Her mood was expansive and bright, with an agitated undertone. Her speech was clipped and pressured. Her insight and judgment appeared poor. She appeared to be responding to internal stimuli."
Appellant was "hyper-religious" at times while hospitalized. For example, after her arrival, she reported "hearing the voice of Satan," and on another occasion she was reluctant to use the pillow on her bed because she had heard that demons can be transferred through fabric. She also told Hudkins, without further elaboration, that "the devil should die."
As noted above, appellant refused to take her medication. She told Hudkins that she was "willing to commit [herself] into someone's care, we don't always know what's best for us." During the same conversation, however, appellant said that she wanted counseling, but not with a counselor or psychologist; she stated, "I can talk with my husband or my family."
Appellant testified at the hearing and, according to the certified mental health examiner who was present, displayed psychotic symptoms consistent with Miller's diagnosis. When asked why the police had taken her to the hospital, appellant responded, in part, "I think love bites sometimes, and I think that *924 when you get a part of the wrong association that that can kind of mix things up; complicate them." When asked what she meant by "love bites," she explained that "love bites" were scars on her husband's arms-"they're more battle wounds than anything because he didn't provide for me, but we've been homeless and we got kicked out on the street by a church."
Appellant testified that she remembered stabbing her husband because she "felt like [she] needed to neutralize the threat" and that voices inside her head told her to do it.
*380 Because of her earlier reference at the hospital to a "covenant," appellant was asked to explain what a "covenant" was; she responded, similarly to her earlier statement, "That means that I am obliged to my husband as my beloved for the rest of my life, but at the moment I felt like I needed to neutralize a threat in my own household." While being questioned by the state, appellant connected the stabbing of her husband to a church she claimed to have attended and also to a flashback, as follows:
"Q: Okay. And you said on the night that you stabbed him you just felt he was a predator?
"A: Absolutely. I think that the church that we had-may I speak, Your Honor?
"Q: Okay. And what made you feel that way?
"A: I think that I had flashbacks of the threat that was actually neutralized in the household that I was currently residing in about four years ago.
"Q: And is there any way you could describe that threat for us today?
"A: Yeah. I have his name. He's actually an ex-Marine and his son is a sniper. And he came home drunk; staggering drunk every night. And my husband and I shared a bedroom with our two kids.
"And if I may be direct, Your Honor, I would say that they're witches because they separated my family, and I'm just trying to get everybody back together on the same page, civilly.
"Q: And that's a flashback you had on the night with your husband?
"A: Yes."
When asked during the hearing when she first began hearing voices, appellant responded, "When I started attending Gordon Spirit Church about four years ago." Shortly thereafter, in response to a question about her age when the voices began, she stated, "I don't mean to be a mad hatter; I don't mean to be rude, but since the day I was born." The examiner asked appellant about the church she referred to and she explained that she was not sure what *381 kind of church that was, but, when asked if the devil was part of that church, she stated, "You know what? I would believe so, sir. * * * But I'm not sure, Your Honor." Appellant testified that the church had told her she could not see her family and also that the church had kicked her out, explaining the reasoning as follows:
"Because I was Jezebel. I don't even know what that means anymore. I would say that I'm part of a religious sect that I no longer want to attend and that it separated my family. I think churches are supposed to be about community and fellowship and I don't believe that that was honorable in any sense or fashion. We felt kind of stranded; domestic slavery, actually. Domestic violence happened in that house. That is another lawsuit for another day."
Appellant's attorney asked appellant whether she was aware that she had been named as the victim of a physical assault in a criminal case that had been filed against her husband. Appellant acknowledged being aware of that and also agreed that the altercation had taken place at her residence.[1]
*925 Appellant initially testified that she did not believe that she had a mental disorder and that she did not want to take medication, stating that "naturopathy is a better route" for her. Later, when questioned by her own attorney, she indicated that she did not disagree with Miller's diagnosis and that she had not been aware that she had mental health issues. She remained consistent in her refusal to take medication, stating that, "as a civil citizen of the United States[, she had] the legal right to decline medications." She denied having any desire to hurt anyone.
*382 The certified mental health examiner also testified. It was his opinion, based on his observation of appellant at the hearing, the information in the precommitment report (including Miller's diagnosis), and appellant's stabbing of her husband, that appellant was a danger to others due to her mental disorder. He stated that he did not
"think it [had] to do with her husband. She's clearly mentally ill with a mental disorder. She's not thinking logically; bases much of what she thinks on psychotic symptoms, on voices that she hears; and makes judgment[s] predicated on those symptoms. Therefore, I don't believe she's able to make logical conclusions * * *."
The examiner characterized appellant's stabbing of her husband as a "psychotic response," due to appellant's false belief that her husband was a predator; according to the examiner, that belief was "part of [her] psychotic symptomology." He also explained that a way to treat the psychotic symptoms would be to take medication, but that appellant had refused to do so. The examiner summed up his opinion regarding whether, based on her mental disorder and unwillingness to take medication, there was a strong probability that appellant would be violent again in the future: "Given similar circumstances, where she believed that someone was a danger to her, she could act out against that person."
At the conclusion of the hearing, the trial court committed appellant to the Oregon Health Authority. See ORS 426.130(1)(a)(C). The court determined by clear and convincing evidence that appellant was "a person with a mental illness." It specifically determined that appellant was a danger to others and found that she would not voluntarily engage in treatment if she were released. The court explained that it based its determination on the stabbing and on appellant's "own statements about having battle wounds with her husband[, which] show[ed] that there's other inciden[t]s of violence or harm to another person."[2]
On appeal, appellant does not challenge the trial court's determination that she has a mental disorder. Rather, *383 she contends that the court erred in determining that she is a danger to others. Appellant asserts that the court improperly committed her, because the stabbing was an isolated incident and, therefore, was a legally insufficient basis on which to conclude that she was a danger to others; appellant further argues that there is no evidence in the record that she had a desire to cause physical injury to anyone or that she had made threats to harm anyone. According to appellant, the evidence offered to establish that she presented a future danger to others, "at most, supported a speculative exercise of mental gymnastics built on conjecture" to reach a determination that appellant would likely commit violent acts in the future. The state argues in response that sufficient evidence supported the trial court's determination that appellant's mental disorder rendered her a danger to others.
"Whether the evidence of danger is legally sufficient to support a determination that appellant is 'dangerous' for purposes of ORS 426.005(1) is a determination that we review as a matter of law." S. R. J. , 281 Or. App. at 748-49, 386 P.3d 99. The state has the burden to prove the statutory requirements for commitment by "clear and convincing evidence." ORS 426.130(1)(a). To prove that a person is a danger to others, the state "must establish that actual future violence is highly *926 likely." State v. M. A. , 276 Or. App. 624, 629, 371 P.3d 495 (2016) (internal quotation marks omitted). When determining whether a person is a danger to others, "it is appropriate for a court to consider the testimony of mental health experts, the person's past acts, and the person's apparent condition at the time of the hearing." State v. D. L. , 202 Or. App. 329, 335, 122 P.3d 97 (2005), rev. den. , 340 Or. 308, 132 P.3d 28 (2006). "Specific acts of violence are not required to establish dangerousness." State v. M. R. , 225 Or. App. 569, 574, 202 P.3d 221 (2009). Rather, past acts, including verbal acts, can justify a finding that a person is mentally ill if the acts "form a foundation for predicting future dangerousness." Id. (internal quotation marks omitted); see also State v. Pieretti , 110 Or. App. 379, 383, 823 P.2d 426 (1991), rev. den. , 313 Or. 354, 833 P.2d 1283 (1992) (the appellant posed a danger to others when, although he had committed no overt violent act against anyone, there was ample evidence to form a foundation for predicting that he would). *384 We have previously recognized that "[f]act matching in these kinds of cases is often of little utility because every involuntary mental commitment case must be decided on its individual facts under the applicable standards." State v. D. L. W. , 244 Or. App. 401, 405, 260 P.3d 691 (2011) (internal quotation marks omitted). Here, viewing the record in the light most favorable to the trial court's determination, S. R. J. , 281 Or. App. at 743, 386 P.3d 99, we conclude that the record contains legally sufficient evidence to support the trial court's determination that appellant posed a danger to others within the meaning of ORS 426.005(1)(f)(A).
The record contains evidence from the mental health professionals who interacted with appellant. Appellant was diagnosed by Miller as having bipolar disorder with psychosis. Miller also noted that she was impulsive and had poor insight and impaired judgment. The investigator, Hudkins, reported that appellant's "insight and judgment appeared poor" and that she "appeared to be responding to internal stimuli." And Goldsmith, the examiner, who had read Hudkins's precommitment report and observed and questioned appellant at the hearing, expressed the opinion that, based on the information in the report and on appellant's condition at the hearing, appellant was a danger to others. Goldsmith took particular note of the facts that appellant had stabbed her husband and that she was psychotic. Goldsmith explained that appellant's belief that her husband was a predator or a threat at the time of the stabbing was part of her psychotic symptomology; he also noted that she had displayed psychotic symptoms at the hearing. In addition, appellant had stated that she did not want to take medication that, according to Goldsmith, would treat the psychotic symptoms. Those considerations led to Goldsmith's opinion that appellant's psychosis caused her to be a danger to others in the future. See D. L. , 202 Or. App. at 335-36, 122 P.3d 97 (commitment affirmed when evidence included mental health experts' prediction of future violence based on the appellant's lack of insight into the dangerous nature of her conduct and her continuing paranoid fears that had led to her firing a gun into a neighbor's wall).
*385 The record also demonstrates that appellant lacked insight into her condition and corresponding need to take medication. She denied at the hearing that she had any desire to hurt anyone, but had reported at the hospital that she had, in fact, had thoughts about hurting others. Appellant provided different explanations for why she had stabbed her husband: because of a "covenant," voices told her to do it, she thought that her husband was a predator, and she thought that she was having a flashback to a prior threat in her house by another man. She continued to believe, at the time of the hearing, that the threat had been real and needed to be neutralized. No matter what appellant's internal motivations may have been, the record before the trial court permitted the determination that appellant's mental disorder caused her to act out in a violent manner. See id.
A rational finder of fact could reasonably infer from appellant's testimony, past behavior that included a violent act, unabated symptoms that included psychosis, lack of willingness to take mediation, lack of insight into her condition, and impaired judgment, that she was likely to engage in future violence *927 if she did not remain hospitalized. The particular circumstances here formed a sufficient foundation upon which to predict future dangerousness. The trial court did not err in committing appellant based on a determination that she was a danger to others.
Affirmed.

We note that the trial court took judicial notice of a criminal case that had been filed in Marion County. It appears that appellant was attempting to advance a theory at the commitment hearing that she was the victim of an assault-with the implication that her act of stabbing her husband was self-defense-although appellant never claimed that she stabbed her husband in self-defense. Limited details about the criminal matter were made a part of the record at the commitment hearing. And, as part of its ruling, the trial court stated that it did "not believe that simply because someone is a victim of a crime that that is mutually exclusive with regards to whether or not someone is a danger to others." That is, the court might have believed that appellant was a victim, but it nevertheless decided that the stabbing was the result of her mental disorder. Viewed consistently with our standard of review, the information regarding the criminal case does not assist appellant.

Appellant asks us to review de novo the trial court's factual finding that the "battle wounds" resulted from a separate incident of violence to be attributed to appellant. However, as noted above, we decline to do so.