LAGESEN, P. J.
*122 Appellant appeals a judgment civilly committing her to the custody of the Oregon Health Authority for up to 180 days on the ground that she has a mental disorder that makes her dangerous to herself and others. ORS 426.130 ; ORS 426.005. She contends that the evidence is insufficient to demonstrate that, because of her mental disorder, she presents the sort of danger to herself or others that permits commitment under ORS 426.130(1)(a)(C) and (2).[1] We agree and, therefore, reverse.
The issue is whether the evidence is sufficient to permit appellant's commitment on the ground that her mental disorder, at the time of the hearing, made her "[d]angerous to self or others" within the meaning of ORS 426.005 (1)(f)(A). We review by "view[ing] the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial *256 court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." State v. M. A. , 276 Or. App. 624, 625, 371 P.3d 495 (2016) (quoting Dept. of Human Services v. N. P. , 257 Or. App. 633, 639, 307 P.3d 444 (2013) ). A person is "dangerous to self" for those purposes if the person's mental disorder puts her at a nonspeculative risk of serious physical harm or death in the near future, absent commitment. State v. S. R. J. , 281 Or. App. 741, 749-50, 755, 386 P.3d 99 (2016). A person is "dangerous to others" for those purposes if her mental disorder makes her highly likely to engage in future violence toward others, absent commitment. Id . at 755, 386 P.3d 99. Because the standard of proof in a civil commitment case is the clear-and-convincing-evidence standard, the evidence supporting commitment must be sufficient to permit the rational conclusion that it is highly probable that the person poses a danger to self or others. Id. at 748, 386 P.3d 99. To meet this "rigorous" standard, the evidence must supply a concrete and particularized "foundation for a prediction of future dangerousness" absent commitment. Id . at 754-55, 386 P.3d 99. *123 In this case, the evidence does not meet that standard. It is undisputed that appellant suffers from severe bipolar disorder. However, as the mental health investigator found, there was "no evidence that she had actually placed herself or others in danger" before her hospitalization that led to the commitment proceeding. Appellant's commitment was precipitated after police and a local mental health crisis team were called to her residence after appellant started "behaving erratically" and stated that she was "going to kill Alisha." After police arrived, appellant asked them to shoot her, but there is no evidence that she behaved in a way that made it likely that they would. She was then taken to the emergency department of the hospital where she presented as paranoid, psychotic, and manic, and was given emergency medications. When she woke up, she was still manic, so she was placed on an emergency mental illness hold and admitted to the hospital.
Throughout her hospitalization, appellant continued to suffer from mania. During the first several days of her hospitalization, appellant's behavior was erratic and involved some "at times *** quite dramatic demonstrations of emotion, including tearfully rolling around on the floor bemoaning her situation, and then standing up and moving on to another topic, the former being completed." Appellant did nothing to harm herself or others during that time, and did not come close to doing so. Then, four days after she had been brought to the hospital, appellant became very upset at being kept in the hospital (which she called a "mental health fish tank"), and started slamming doors, yelling at nurses, throwing things in her room, and threatening to hang herself. She also threatened to slit the throat of a staff member, but retracted that statement. She was placed in seclusion, where she started banging her head on the floor. When staff entered the room to further restrain her, she kicked a male nurse in the genitals and continued to bang her head on whatever she could. Concerned that she had been hitting her head hard enough to cause a brain injury, medical staff arranged for a CT scan, but the scan showed no injury-appellant suffered only a minor abrasion.
At that point, the hospital decided to initiate commitment proceedings. When appellant was told that she might *124 face commitment for up to 180 days, appellant responded that she would kill herself that night. Appellant also at one point asked nursing staff to give her enough pills so that she could kill herself, wrote letters saying "kill me, please," and was overheard telling her mother on the phone that she wanted to kill her.
At the commitment hearing, the mental health examiner opined that he thought that appellant's suicide threats were "difficult to take serious[ly]" because she made them so "freely." However, the examiner was concerned by the "escalation to *** self-harm" that had occurred on the date that appellant had to be put into seclusion and restrained. Appellant's treating psychiatrist testified at the hearing that he thought that appellant was dangerous to herself and others because of her behavior while hospitalized. In his opinion, the most dangerous thing that appellant had done was to bang her head against a mirror.
*257 That evidence makes clear that, at the time of the hearing, appellant was in need of further treatment for her mental disorder. But what the evidence does not permit is the conclusion that it was highly probable that, absent commitment, appellant's mental disorder put her at risk of serious physical harm either to herself or others. That is because it does not permit the inference that it is highly probable that appellant's mental disorder would make her act dangerously outside the hospital setting. As noted, there is no evidence that appellant has any history of violence or self-harm outside the hospital setting. The incidents of violence and self-harm-particularly when resisting restraint-that took place in the hospital do not permit the inference that appellant posed a risk of near-term harm to herself or others, were she not to be committed, because the state presented no evidence that would allow for the rational conclusion that appellant was at risk of behaving the same way were she not involuntarily hospitalized. See S. R. J. , 281 Or. App. at 754-55 & n. 5, 386 P.3d 99 (discussing cases where violence in reaction to restraints on liberty was insufficient to demonstrate that person was dangerous in a way that permits commitment, and noting that "there would be a certain irony to involuntarily hospitalizing a person because that person engages in *125 threatening behavior when involuntarily hospitalized"). In particular, the state introduced no evidence from appellant's treating psychiatrist, or from any other source, indicating how appellant's conduct inside the hospital was predictive of her conduct outside of it. Such evidence was essential to form the necessary "foundation for a prediction of future dangerousness" where, as here, there is no evidence that she had actually placed herself or others in danger prior to hospitalization and where, as here, there was no evidence that the conduct while hospitalized was anything other than reactive to the conditions of the hospitalization. The state's failure to adduce it in this case means that we must reverse.
Reversed.

Appellant also contends that the evidence is insufficient to permit commitment on the ground that her mental disorder makes her unable to meet her basic needs, ORS 426.005(1)(f)(B). Because the trial court did not commit her on that basis, we do not address that contention.