Submitted February 26, affirmed October 9, 2019

In the Matter of Z. W. Y.,
a Person Alleged to have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

Z. W. Y.,
*Appellant.*

Marion County Circuit Court
16CC06622; A167562

450 P3d 553

Appellant in this civil commitment case appeals an order continuing his commitment to the Oregon Health Authority for an additional period not to exceed 180 days. On appeal, appellant asserts that the trial court erred in determining that he was a danger to others because there was insufficient evidence in the record that he has seriously harmed anyone in the past. *Held*: The record, which included evidence of angry delusions leading to violent behavior before appellant's commitment, was sufficient to support a finding that appellant was highly likely to harm others if he were released.

Affirmed.

Janet A. Klapstein, Judge pro tempore.

Joseph R. DeBin and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Inge D. Wells, Assistant Attorney General, filed the brief for respondent.

Before Hadlock, Presiding Judge, and DeHoog, Judge, and Aoyagi, Judge.

HADLOCK, P. J.

Affirmed.

**HADLOCK, P. J.**

This appeal is from an April 2018 order of continued commitment for mental illness. It serves as a counterpart to *State v. Z. W. Y. (A166276)*, 299 Or App 703, 450 P3d 544 (2019), which was appellant's appeal from an earlier continued-commitment order. We reversed the order in *Z. W. Y. (A166276)* because the record, which included no evidence that appellant had ever harmed another person physically, did not support the trial court's determination that appellant's mental disorder made him a danger to others. *Id*. at 707-08. Here, we reach the opposite result. In this case, more complete development of the record provides evidence that appellant's disorder *has* led him to engage in violent acts in the past, that he has a longstanding and intensely angry desire to punish A, a woman with whom he believes he has a relationship, and that his desire to retaliate against A for her perceived wrongdoing "will become much more urgent" if he is released from the hospital and stops taking his medications. Accordingly, we affirm.

The task for the trial court in this continued-commitment proceeding was to "determine whether the person is still a person with mental illness and is in need of further treatment." ORS 426.307(6). The state sought continued commitment because, it contended, appellant's mental disorder made him a danger to others. Accordingly, the question for the trial court was whether appellant's mental disorder made him "highly likely to engage in future violence toward others, absent commitment." *State v. S. E. R.*, 297 Or App 121, 122, 441 P3d 254 (2019). A court can make such a determination only if the evidence supplies "a concrete and particularized foundation" for that prediction of future dangerousness. *Id*.[1]

The record in this case includes evidence on three main topics: appellant's mental disorders; appellant's resulting focus on A, who has obtained a stalking protective order against him; and appellant's past interactions with other

---

[1] The court observed at the start of the hearing that we had reversed one of appellant's earlier continued-commitment orders. Both parties and the court agreed that, notwithstanding the reversal, this hearing could proceed as a continued-commitment hearing without the state initiating new commitment proceedings.

individuals, some of whom also have obtained protective orders against him.[2] The evidence came in through the testimony of Dr. Wolf, who has been in charge of appellant's treatment at the Oregon State Hospital since March 2018; appellant's testimony; and two exhibits offered by appellant—a detailed March 2018 treatment care plan and a one-page March 2018 "RN Risk/Safety Assessment."[3]

We start by describing the evidence related to appellant's mental disorders. Appellant has been hospitalized (and, briefly, in jail) since he was arrested in 2015 and sent to the Oregon State Hospital "for aid and assist evaluation." He was admitted to the state hospital as a patient in January 2017, presenting with a "collection of delusional ideas, paranoia, agitation and stalking behavior" that was "consistent with a diagnosis of schizophrenia." Wolf, who has been in charge of appellant's treatment since March 2018, testified that appellant now has been "diagnosed with schizophrenia, paranoid type, and autism spectrum disorder." Appellant's disorder causes him to have delusions that "significantly affect his ability to live in society safely," in part because he believes that he emanates an odor that prevents him from living in an apartment or residential facility with other people; he prefers to be homeless. Appellant's disorder has caused him to present as "intense[ly] angry" and to be violent toward others in the past.

Appellant takes both antipsychotic and antidepressive medications at the state hospital. He has indicated that he will stop taking medications if released. If that happens, Wolf testified, "the intensity and compulsion of his delusional beliefs will very soon reach the point where * * * this angry desire to retaliate and punish [A] will become much more urgent than it is right now."

_____

[2] Witnesses used the terms "restraining order" and "stalking order" interchangeably throughout the hearing to refer to the protective orders that three individuals have (or have had) against appellant. The record reflects that one of those orders (the one held by A) is a stalking protective order. The nature of the other protective orders referenced at the hearing is not clear.

[3] The "RN Risk/Safety Assessment" is a form that lists various conditions and provides space for the person completing the form to indicate their relevance, if any, to a particular patient. For appellant, the completed form states "History" in relation to the condition of "Danger to Others Related to Aggressive/Homicidal Behavior." It provides no additional detail.

Wolf also testified about how appellant's disorder manifests with respect to his "unusual beliefs" about A:

"[A] belief that he has is that there is a young woman[, A,] in [the] community that he believes should be his girlfriend and he has been stalking that woman and had a [stalking protective] order filed against him and he violated that [stalking protective] order. He doesn't believe that it's a valid restraining order and he [believes that he] shouldn't have any restraining order. He believe[s] that it's in fact [A] that has been harassing him and following him."

Before appellant was hospitalized, he repeatedly violated the stalking protective order, which is described as having had "no effect on his behavior." A felt "unsafe" with appellant's behavior and made several police reports. Before his most recent arrest, appellant went to the store where A worked. He was confronted by four men and threatened to shoot them, although he later denied having had a firearm.

When admitted to the state hospital, appellant stated that he hated A and "want[ed] to make her pay for what she did to [him]." Wolf testified that, when initially hospitalized, appellant was very angry at A and "was talking about stabbing and fighting her, stabbing her or strangling her." Appellant's focus on A is caused by or connected to his schizophrenia; he has a "delusional perception of events" about her actions. Appellant's treatment plan indicates that, after being hospitalized, appellant made repeated attempts to try to contact A by telephone and mail despite the stalking protective order.

Wolf testified that appellant believes that A has made false accusations against him that have led to his imprisonment and hospitalization. He wishes to resolve the situation by meeting with A and getting the protective order overturned. At a planning session in March 2018, appellant stated that he wanted A "to know how this has affected" him, asserted that he will email A, and stated that he "would prefer to own a gun" and "would shoot another individual in self defense."

Appellant testified on his own behalf at the hearing. He acknowledged that he had "been angry at [A] for a long time" and that A had obtained a stalking protective

order against him. Appellant testified that he had sent "a vaguely threatening response" to messages from A's friends telling him to leave A alone; he did that because he thought that some of those messages were themselves threatening.

Appellant also testified that he had "kind of wanted to" hurt A and "kind of fantasized about it." Appellant "kind of talked to [himself], well, if there's one person [he] should kill, it's her," at least in part because appellant perceived that A was harassing him. When asked if he still felt that way or no longer wanted to harm A, appellant responded obliquely:

"A:  I have mixed feelings. First I liked her and then I don't like her.

"Q:  But do you have any plans to hurt her?

"A:  That would be illegal. I don't have plans to do anything illegal."

Later in the hearing, a mental-health examiner asked appellant about his statement that, if there was a person he should kill, it would be A. Appellant initially said that he "didn't mean it" and "it sounds worse than what [he] meant." When the examiner remarked that appellant's statement had been "pretty serious," appellant responded that he "kind of feel[s] threatened by" A. By that point in the hearing, appellant had also indicated that he would like to obtain a gun, and the colloquy continued with the examiner following up on appellant's possible response to feeling threatened by A:

"[Examiner]:  Okay. And so your way of responding is to, if you could, get a gun to protect yourself?

"[Appellant]:  If I thought someone was planning to kill me or something.

"[Examiner]:  Okay.

"[Appellant]:  That's the way it seems sometimes."

Appellant acknowledged that he would stop taking medications if released from the hospital, and he did not deny that he would try to make contact with A:

"I think she lives in Gresham now, so I would have to go over to Gresham, and I'm not sure exactly where she

lives, so I think my Facebook account was deleted so I could probably send her a message on Facebook but she probably blocked me after I did that, or maybe she doesn't get messages on Facebook, so I don't know. I don't know if I would really even be able to."

Appellant thinks that he and A "could maybe be friends or something."

The record also includes evidence about past aggressive conduct by appellant toward others. Wolf testified that appellant had said that he assaulted his own mother when he was 19 or 20 years old (appellant is now in his early 30s), and his mother then filed for a restraining order against him. Another woman had also obtained a protective order, Wolf testified, "so [appellant] does have a history of assaults and threats of assault and restraining orders against him before."

When he testified, appellant did not dispute Wolf's statements about appellant's past. Rather, he acknowledged that three people had obtained protective orders against him: A, appellant's mother, and the wife of appellant's father. The latter two individuals obtained those orders about 10 or 15 years ago, by appellant's estimate. Appellant testified that he had shoved his mother during an argument over a comic book, and then "was on probation for a year and a half" and his mother "got a restraining order against [him]."

Appellant also testified that, in 2015, he got into a fight with a security guard; they were arguing and appellant jabbed the guard with his elbow "really hard." Appellant was arrested and served "six months probation" for assault or battery. Appellant already was on probation for another assault at the time he jabbed the security guard.

At the close of the hearing, the examiner explained why he had concluded that appellant is a danger to others, specifically A:

"So I would recommend commitment to the State Hospital or to the Division, and the reason why I'm recommending it is paranoid schizophrenia can be quite dangerous, but coupled with autism and the ability to extremely focus with no insight makes it dangerous. He said here in court if there was one person I should kill, it would be her, and in the

records he talks about wanting to get a gun and get his charges overturned so he can purchase a gun. Given that when he leaves here, he says he won't take his medication and his complete lack of insight is a very dangerous situation. He has a history of being on probation for battery, so there is that history of violence which I'm taking into account, along with no insight and he continues to be angry at the situation and he's not willing to commit to any kind of discharge planning that might help him in the future other than go live in the woods. *** [T]he medications don't seem to be helping with that deeply rooted delusion about [A] ***. He continues to talk about having a platonic relationship with her, if possible. So it's my opinion that he is dangerous to others and he should be recommitted."

The trial court continued appellant's commitment based on a determination that "his delusional belief system is still active" and that he is dangerous to others. To the extent that appellant denied that he wanted to hurt anybody, the court found him not credible because, "as he has said even here with multiple people present, he would sure like to own a gun and he thinks that if there was anyone in the world he would like to kill, it would be [A]."

On appeal, appellant contends that the record does not support the trial court's decision because it "lacks testimony that appellant has ever caused anyone serious physical harm or that there was a sufficient foundation to find he would be highly likely to cause someone serious physical harm in the near future." Appellant also suggests that the record does not establish that he poses a danger to A because it does not include sufficient evidence that he knows where she lives or how to contact her. Appellant also points to evidence that he has not harmed anybody since he has been hospitalized. In response, the state points to evidence of appellant's anger toward A and his assaults on other people, asserting that the record is sufficient to support a determination that future violence is highly likely.

We agree with the state. The record in this case, viewed in the light most favoring the trial court's commitment decision, provides "a concrete and particularized foundation for a prediction of future dangerousness." *S. E. R.*, 297 Or App at 122.

The evidence of defendant's longstanding, angry delusions about A can reasonably be viewed as compelling. Even after A obtained a stalking protective order, appellant continued to pursue her, violating that order multiple times and threatening to shoot other individuals at A's workplace. In the nearly two years since he was admitted to the state hospital, appellant's anger toward A has persisted; he wants to "make her pay," has talked about stabbing or strangling her, and continued attempting to contact her. At the hearing, appellant testified about having wanted to hurt A and having fantasized about it; he did not deny that some of those feelings continued. Appellant also has repeatedly expressed a desire to own a gun and, at the hearing, testified in a manner that the trial court could fairly understand to suggest that he had contemplated using that gun to kill A. And appellant made all of those statements while a patient at the state hospital, undergoing treatment. If he were released and stopped taking medications, as he intends, his "angry desire to retaliate and punish [A would] become much more urgent" than it was at the time of the hearing.

Appellant's threats are not the only evidence pointing toward the likelihood that he would be dangerous to others if released. In the months preceding his 2015 hospitalization, appellant assaulted a security guard while already on probation for some other assaultive behavior; that assault on the guard took place during an argument. Several years before that, appellant assaulted both his own mother—again in the context of an argument—and his father's wife. The evidence of those assaults provided an adequate basis for the trial court to infer that appellant's mental disorder, which causes angry delusions, also leads appellant to engage in physically violent behavior.[4] Given appellant's persistent, intense anger at A, the evidence that those feelings will become "much more urgent" if appellant is released, and appellant's desire to obtain a gun and to contact A when he gets out of the hospital, the court could

---

[4] The record in *Z. W. Y. (A166276)* included no such evidence. *See* 299 Or App at 706 (noting state's acknowledgement that "the record includes no evidence that appellant has physically harmed A or anyone else"). In addition, the record in this case includes more detailed information about appellant's desire to obtain a gun and, significantly, his statements suggesting a possible link between that desire and his continuing intention to contact A.

fairly infer that appellant was "highly likely to engage in future violence toward others, absent commitment." *S. E. R.*, 297 Or App at 122; *see State v. T. T.*, 293 Or App 376, 385, 428 P3d 921, *rev den*, 364 Or 209 (2018) (record was sufficient to establish that the appellant's mental disorder made her dangerous to others, even though it included evidence of only a single physically violent act, because the appellant's psychotic symptoms were unabated, she was unwilling to take medication, she lacked insight into her condition, and she had impaired judgment).

Affirmed.