Submitted September 6, 2018, affirmed October 9, 2019

In the Matter of S. T.,
a Person Alleged to have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

S. T.,
*Appellant.*

Marion County Circuit Court
6635; A164442

450 P3d 529

Appellant in this civil commitment case appeals an order continuing his commitment to the Oregon State Hospital for an additional period not to exceed 180 days. On appeal, appellant asserts that the trial court erred in determining that he still has a mental illness and is in need of further treatment because his mental disorder makes him dangerous to others. *Held*: The record was sufficient to support a finding that appellant required commitment because he was likely to stop taking his medications if he were not hospitalized and would be a danger to others if not treated.

Affirmed.

Daniel J. Wren, Judge pro tempore.

Alexander C. Cambier and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Christopher A. Perdue, Assistant Attorney General, filed the brief for respondent.

Before Hadlock, Presiding Judge, and DeHoog, Judge, and Aoyagi, Judge.

HADLOCK, P. J.

Affirmed.

**HADLOCK, P. J.**

Appellant was committed to the Oregon Health Authority in 2016 because of mental illness and, in the proceeding that is the subject of this appeal, the trial court continued the commitment on the ground that appellant "still has mental illness * * * and is in need of further treatment." The court's determination was based on a finding that appellant's mental disorder makes him dangerous to others. Appellant challenges that determination on appeal. For the reasons below, we reject appellant's arguments and, accordingly, affirm.

In a continued-commitment proceeding of the kind involved here, the trial court's task is to "determine whether the person is still a person with mental illness and is in need of further treatment." ORS 426.307(6); *see also State v. M. G.*, 296 Or App 714, 717, 440 P3d 123 (2019) (explaining continued-commitment process). As pertinent here, "person with mental illness" is defined to include a person who, because of a mental disorder, is "[d]angerous to * * * others." ORS 426.005(1)(f). A person is dangerous to others, for purposes of the commitment statutes, if the person's mental disorder makes the person "highly likely to engage in future violence toward others, absent commitment." *State v. S. E. R.*, 297 Or App 121, 122, 441 P3d 254 (2019). "Because the standard of proof in a civil commitment case is the clear-and-convincing-evidence standard, the evidence supporting commitment must be sufficient to permit the rational conclusion that it is highly probable that the person poses a danger to * * * others." *Id.* Accordingly, "the evidence must supply a concrete and particularized foundation for a prediction of future dangerousness absent commitment." *Id.* (internal quotation marks omitted).

In reviewing a trial court's decision to determine whether those standards were met, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013);

*see* *S. E. R.*, 297 Or App at 122 (applying that standard in the commitment context).

The sole witness at appellant's continued-commitment hearing was Dr. Shad, who is a treating psychiatrist for appellant at the Oregon State Hospital. Dr. Shad testified that appellant's psychiatric problems started when appellant was 49 or 50 years old, a few years before the hearing. Appellant has been diagnosed with schizophrenia. In addition, medical imaging shows that a particular lobe of appellant's brain is "completely missing." That imaging, along with appellant's particular history,[1] indicate that he may have a kind of dementia called Pick's Disease. According to Dr. Shad, individuals with that kind of dementia "present with personality changes, like sexual dis-inhibitions [and] behavioral dis-inhibitions." Dr. Shad testified that appellant's "personality changes can be explained more on the basis of this anatomical presentation we are seeing, rather than schizophrenia by itself." Before starting to present signs of Pick's Disease, appellant had no history of mental disorder.

Appellant initially was hospitalized in Coos County and later was transferred to the state hospital. In October 2016, appellant once called another patient a "golden good boy," a scuffle broke out, and appellant punched the other patient in the face. In December 2016, another patient accused appellant of stealing his gloves; the two men exchanged punches, with appellant yelling, "I'm going to shoot you." Dr. Shad testified that those incidents of aggression "absolutely" reflect behavioral issues stemming from the changes in the structure of appellant's brain.

Dr. Shad acknowledged that appellant had engaged in only a few acts of aggression, but testified that "the reason for that could be that [appellant] is being treated all this

―――――――――

[1] Medical reports on which Dr. Shad relied indicated that appellant had been charged with strangling his wife in 2014 and that there had been reports of appellant threatening children and trying to lure them to his house. The trial court allowed Dr. Shad to testify to that information to explain how he reached his diagnosis and recommendations, but the court ruled that, because the testimony as to those events was hearsay, it would "not be using them for the truth that they are asserting."

time with medications" that could be "checking this behavior." Dr. Shad had no doubt, however, that the "very complete evidence of brain change" is associated with appellant's "personality changes." Dr. Shad's "biggest concern" centered on the fact that additional neurological changes that occur with advancing age "can further complicate [appellant's] behavior."

Dr. Shad testified about the medications that appellant takes at the state hospital. There is "no ideal approved drug for this condition which he has." However, appellant is given antidepressants, for which there is some evidence of efficacy, and antipsychotic medications that are used to treat the delusional and psychotic aspects of his illness. Appellant still has a number of delusions despite being on medication, possibly because of the changes to his brain. Nonetheless, Dr. Shad testified, appellant's medications positively affect appellant's ability to control his aggression.

If appellant were to continue taking the medications, Dr. Shad was doubtful that appellant's pre-hospitalization behaviors would recur. However, appellant "has extremely poor insight to his illness," has no insight about why he is taking medications, and has stated that he does not need the medications. Dr. Shad did not believe that appellant would take his medications if he were discharged. If appellant stops taking the medications, his aggressive behaviors are likely to come back. Accordingly, appellant could present a risk to the community if he is not taking medications. For that reason, Dr. Shad believed that appellant is a danger to others. However, Dr. Shad had never personally witnessed appellant engage in any violent or aggressive acts.

Appellant repeatedly interjected comments during the continued-commitment hearing, asserting that he had never met Dr. Shad and denying that he had the conditions or had engaged in some of the aggressive behaviors that Dr. Shad described. Dr. Shad testified that those comments reflect appellant's medical condition: "He just cannot stop this impulse to react and to be impulsive." The trial court continued appellant's commitment based on Dr. Shad's testimony and appellant's interruptions, including his denial of "any issues or concerns."

Appellant raises two claims of error on appeal. In his first assignment of error, appellant argues that the trial court violated his rights under the Fourteenth Amendment to the United States Constitution when it admitted progress notes from appellant's hospitalizations and allowed testimony based on those notes. We reject that assignment of error without discussion.

In his second assignment of error, appellant challenges the trial court's determination that he is a person with mental illness, arguing that the record does not support a determination that his mental disorder makes him a danger to others. In particular, appellant emphasizes that evidence of his two physical altercations while hospitalized occurred more than two months before the commitment hearing and that no evidence was admitted (other than for illustrating the basis for Dr. Shad's opinions) regarding his conduct before being hospitalized. In response, the state emphasizes the evidence that appellant will stop taking medications if discharged and, even while hospitalized, had fought with other patients.

The question before us is whether the evidence described above, viewed in the light most favoring the state, provides "a concrete and particularized foundation for a prediction of future dangerousness absent commitment." *S. E. R.*, 297 Or App at 122 (internal quotation marks omitted). Although this is a close case, we conclude that it does.

Admittedly, the record is not as developed as one might wish. Dr. Shad did not testify about the typical progression of Pick's Disease or what behaviors might be expected to increase (or decrease) in frequency or severity as a person continues to live with that condition. No evidence directly indicates whether appellant's two post-hospitalization fistfights were part of a pattern of aggressive behavior or whether appellant's aggression was escalating over time. And, although Dr. Shad testified that defendant's pre-hospitalization behaviors (those that reportedly led to appellant's initial commitment in 2016) were likely to recur if he stopped taking his medications, no evidence was

admitted, for its truth, identifying what those behaviors were.

However, the question is not whether the record is fulsome; the question is whether the record is legally sufficient. Although the record does not include potentially helpful information like that described above, it does include evidence that appellant's mental disorder leads him to be impulsive and physically aggressive, that his disorder manifested only within the last few years, and that it was the behaviors associated with appellant's disorder that led to his original hospitalization. The record also reveals Dr. Shad's "biggest concern"—that, as appellant ages, additional neurological changes may "further complicate his behavior." From that evidence, the trial court could reasonably infer that appellant's mental disorder causes him to be physically aggressive to some extent even when he is hospitalized and taking medications and that, given the changes to the structure of his brain, that condition is likely to worsen over time.

Based on Dr. Shad's testimony, the court also could reasonably find that appellant would stop taking medications if he were not hospitalized and that, in the absence of such treatment, appellant's impulsive behaviors and the associated verbal and physical aggressiveness would increase. Because appellant already has instigated or escalated physical confrontations with other patients even while being treated for his disorder in the hospital, the trial court could reasonably determine, based on the evidence in this record, that appellant would present an even greater danger to others if he were released. *See State v. T. T.*, 293 Or App 376, 385, 428 P3d 921, *rev den*, 364 Or 209 (2018) (record was sufficient to establish that the appellant's mental disorder made her dangerous to others, even though it included evidence of only a single physically violent act, because the appellant's psychotic symptoms were unabated, she was unwilling to take medication, she lacked insight into her condition, and she had impaired judgment); *cf. State v. E. D.*, 264 Or App 71, 75, 331 P3d 1032 (2014) (evidence of a single fistfight was insufficient to support commitment where the record indicated it was "an isolated act" that did not

provide a basis for concluding that the appellant presented "an ongoing danger to others").[2] The record provides a sufficient, if not elaborate, basis for predicting appellant's future dangerousness.

Affirmed.

---

[2] Although appellant's physically aggressive acts occurred in a hospital setting, the record does not suggest that they were responses to being restrained or involuntarily held. Thus, this case is not like those in which we have held that a person's violent acts that are a result of being hospitalized cannot, themselves, form the basis for further hospitalization. *See State v. S. R. J.*, 281 Or App 741, 755 n 5, 386 P3d 99 (2016) ("We note that there would be a certain irony to involuntarily hospitalizing a person because that person engages in threatening behavior when involuntarily hospitalized.").